UNITED STATES, Appellee

v.

JOHNNIE L. ISBELL, Private First Class, U. S. Army, Appellant

3 USCMA 782, 14 CMR 200

MAJ Edwin Doran, U. S. Army, and 1ST LT Richard B. Dempsey, U. S. Army, for Appellant.

LT COL William R. Ward, U. S. Army, and 1ST LT Kenneth A. Howard, U. S. Army, for Appellee.

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A general court-martial convened by the Commanding General, First Infantry Division, in Bamberg, Germany, convicted the accused of housebreaking and larceny, violations of Articles 130 and 121, respectively, of the Uniform Code of Military Justice, 50 USC §§ 724, 715. He was sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for one year. The findings and sentence were approved by the convening authority, but execution of the punitive discharge was ordered suspended until the accused's release from confinement or completion of appellate review, whichever is the later date. Following affirmance of this action by an Army board of review, we granted the accused's petition for review to consider his contention that improper command influence deprived him of a fair trial.

In view of the nature of the single issue, a review of the incident giving rise to the charges is unnecessary. We go directly to the facts upon which the question turns, and set them forth in the order of their occurrence.

On September 9, 1952, the Commanding General, United States Army, Europe, directed a communication entitled "Retention of Thieves in the Army," to the Commanding General, First Infantry Division. The latter, in turn, distributed this communication throughout the division through normal command channels. The portions of this document material to the present case are as follows:

"1. In certain recent General Courts Martial cases courts have properly found the accused guilty of larceny of substantial sums of money and property and then after establishing that the accused was a thief, have given sentences which improperly retain him in the Service. In view of this it appears absolutely necessary that your attention be invited to the following provisions of the Manual so that you may take the necessary action to prevent other such errors from occurring.

"2. First, the greatest care should be exercised in the selection of officers who are to be appointed as members of all courts martial. They must be the best qualified by reason of age, education, training, experience, length of service, and judicial temperament. Moreover, when the individual members have verified by their performance that they have those qualities, it is proper that you recognize that fact by appropriate notation on their efficiency report or by other written communication."

After suggesting that instructions be given to court members in accordance with paragraph 38, Manual for Courts-Martial, United States, 1951, the letter described the seriousness of larceny and the adverse effects of inadequate sentences as set out in paragraph 33h, 128b, and 76a(5) of the Manual, supra. In conclusion, it said:

"5. From these quotations it is obvious that duly constituted authority considers that the Army is no place

784

for thieves. Those who have been acquainted with the Service for many years know most well that the Military Service depends upon the honesty and integrity of the individual as much or more than any other walk of life. Failure to recognize this fact is a most serious deficiency and must be corrected."

Evidently the suggestion concerning instructions was adopted, for on December 4, 1952, Headquarters, First Infantry Division, circulated a "Staff Judge Advocate Bulletin" to all officers and warrant officers of the command. This bulletin, published for the stated purpose of providing future guidance, reviewed various errors and irregularities in the conduct of courts-martial occurring during the preceding three months. The principal errors referred to were ·inadequate sentences and improper acquittals. As illustrations of the former, several sentences were described, and a provision of the Manual for Courts-Martial, supra, was quoted as applicable under the circumstances. Typical of these illustrations is the following:

"b. In September we had four general court-martial cases where accused were each tried and convicted of larceny of Government or private property with a value in each case exceeding $50.00. All four of these cases resulted in the accused receiving only a bad conduct discharge, six months confinement and a partial forfeiture of pay per month. The Federal Criminal Code of the United States and most of the criminal codes of the various states define grand larceny as being the unlawful taking of property exceeding $50.00 in value and further classify that offense as a felony. A conviction for grand larceny in a civil criminal court will warrant a penitentiary sentence and in military law warrants a dishonorable discharge. In connection with the utilization of bad conduct discharges the following language from paragraph 76a (7), MCM, 1951, is pertinent:

'A bad conduct discharge may be imposed in any case in which a dishonorable discharge may be imposed as well as in certain other cases. It is a less severe punishment than dishonorable discharge and is designed as a punishment for bad conduct rather than as a punishment for serious offenses of either a civil or military nature. It is appropriate as punishment for an accused who has been convicted repeatedly of minor offenses and whose punitive separation from the service appears to be necessary.'

"c. Normally, when an accused receives a punitive discharge, either a dishonorable discharge or a bad conduct discharge, as an incident thereto, *total forfeiture of pay is appropriate and is authorized* (see par. 126h (2), MCM, 1951."

Upon the subject of acquittals, the following was said:

"a. There were seven cases tried by special court-martial in September which resulted in acquittals and ten such cases tried in October which resulted in acquittals. This is a sharp increase over previous months in 1952. Of the aggregate it is considered the evidence of record would have warranted findings of guilty in twelve of these cases. A discussion of some of the cases follows.

"b. The accused here was charged with the operation of a motor vehicle while drunk. Two military policemen, who had arrived at the scene of the accident involving the accused's automobile, testified he was under the influence of alcohol. A doctor who examined the accused shortly after his arrest testified he was 'greatly under the influence of alcohol.' The court had before it not only the nonexpert testimony of the military policemen, which was competent opinion evidence (par. 138e, MCM, 1951), but also the testimony of an expert witness. The Manual for Courts-Martial defines drunkenness as an intoxication which is sufficient to impair the rational and full exercise of the mental and physical faculties of the person involved (see par. 191, MCM, 1951).

"c. Another case involved the of-

fense of alleged possession of false passes by two soldiers. The evidence before the court established both soldiers were found in possession of the passes by a gate guard when they attempted to leave the military kaserne. The passes were not executed by the company commander and at the trial both accused testified they purchased the passes from another soldier. Such uncontroverted evidence leaves little doubt that the court erred in finding these soldiers not guilty."

At the trial, before the pleas were entered, the defense introduced both documents in evidence. The Staff Judge Advocate Bulletin was designated Defense Exhibit A, and the letter relating to "Retention of Thieves in the Army" was marked Defense Exhibit B. The members of the court were then examined on voir dire relative to their familiarity with the contents of these exhibits. During the course of this examination, the president testified that in the four months preceding the trial of this case he attended numerous command conferences in his capacity as Division Finance Officer. At these conferences the subject of military justice, among others, was discussed. Particular reference was made to the subjects of reasonable doubt, the exercise of clemency, and the imposition of appropriate sentences. Mention was also made of several instances in which courts had acquitted individuals whose guilt was clearly indicated by the evidence. While he had read both Exhibits, he asserted that their contents would not influence his deliberations upon the findings or the sentence in the instant case. All but one of the other members of the court acknowledged familiarity with one or both of the exhibits, and all denied that they would be influenced by this information in the particular case. At the conclusion of this examination, the defense counsel unsuccessfully challenged the court members, assigning the same cause now urged before this Court. In substance, the contention is that the command conferences attended by the president of the court, and Defense Exhibits A and B, constitute violations of Article 37, of the

**786**

Code, supra, 50 USC § 612. These violations, it is argued, precluded the possibility of the court members exercising their free and independent judgment in the case, and, thus, the accused was deprived of due process of law.

There can be no doubt that every person tried by court-martial is entitled to have his guilt or innocence determined by the court solely upon the evidence presented at the trial, free from all unlawful influence exerted either by military superiors or others. On the other hand, the responsibility of a commanding officer for the maintenance of discipline within his command and the proper conduct of courts-martial cannot be questioned. In matters of discipline, failure to curb the unlawful tendencies of subordinates may demonstrate a lack of capacity to command. His responsibility in the field of military justice is equally clear. Members of courts-martial are selected from his command. While functioning as summary or special courts-martial they are required to conduct the proceedings without the guidance of a law officer or others skilled in military law. The sentence procedures of general courts-martial involve the application of the complicated provisions of the Manual for Courts-Martial, United States, 1951, normally without special instructions from a law officer. The successful performance of these duties demands thorough training in the provisions of the Uniform Code of Military Justice and of the Manual for Courts-Martial. Moreover, when members of courts-martial demonstrate their unfamiliarity with the requirements of the Code or the Manual, the necessity for additional instructions, especially on the matters relating to their deficiencies, is mandatory, if courts-martial are to serve a useful purpose.

The steps taken by a commanding officer to correct deficiencies, however, must be limited to *instruc-* *tions,* and should not extend to any action amounting to censure, reprimand, or admonition of the court. In this particular, Article 37, supra, provides:

"No authority convening a general,

special, or summary court-martial, nor any other commanding officer, shall censure, reprimand, or admonish such court or any member, law officer, or counsel thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in the conduct of the proceeding."

In the case at bar, the Staff Judge Advocate, in his bulletin published openly to the command, cited several errors observed in records of trial. Although these errors were characterized as deficiencies, neither the courts responsible for their commission, nor the accused involved, were identified by name or description. Each specification of improper action was followed immediately by instructions in the language of the Manual for Courts-Martial. There can be no doubt, from the illustrations used, that the actions described were improper, and that the condition was generally prevalent throughout the division. Under these circumstances, corrective action in the form of further instructions to the personnel of the command was required. Taken singly, or read as a whole, it cannot be said that the matters covered by Exhibit A constituted a censure, reprimand, or admonition to any court member. Rather, it is quite clear that the Bulletin is simply what it purports to be, namely, a discussion of errors, designed as instructions for future guidance.

Since the subjects discussed at the command conferences described by the president of the court were the same as those referred to in Exhibit A, there was no violation of Article 37, supra.

We turn finally to a consideration of Defense Exhibit B, "Retention of Thieves in the Army." The same letter was considered by this Court in United States v. Littrice, 3 USCMA 487, 13 CMR 43. In that case, we reviewed the conflicting positions relating to command control which were presented to Congress while the Uniform Code was under consideration. We concluded that Congress had recognized the problem of maintaining the delicate balance between justice and discipline, and had drafted the Code so as to prevent one from overwhelming the other. Rather than completely divorce military justice from command, safeguards were erected to free court-martial members from any improper or undue influence by commanders which could conceivably affect an honest and conscientious consideration of the guilt or innocence of an accused. In this particular Article 37, supra, further provides:

". . . No person subject to this code shall attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or reviewing authority with respect to his judicial acts."

In the Littrice case, supra, the convening authority appeared before a court-martial convened for the trial of an accused charged with larceny. Immediately before trial began, he read them several instructions, including the letter designated in this case as Defense Exhibit B. As an abstract proposition, and when used solely as a precept to subordinate commanders, the letter was not objectionable, but we condemned its use in that case. There we held that *when read to the members of a court-martial immediately before trial,* and in connection with instructions upon retaining thieves in the Army, the reference to efficiency reports amounted to a veiled threat.

The circumstances of the instant case are entirely different. Here the letter was disseminated to the command as a part of a general program of indoctrination and instruction. When this document was distributed, the offenses of which the accused was convicted had not been committed, nor had the court-martial before which he was tried been appointed. Therefore, references to efficiency reports can hardly be said to contain any threat to the members of a court, without distorting the plain language of the letter beyond its usual and intended meaning. As used in this case,

the letter of the Commanding General, United States Army, Europe, was an appropriate directive to a subordinate commander. Such use was a legal one. There is neither error nor prejudice to the rights of the accused.

We conclude that neither the questioned exhibits nor the command conferences deprived the accused of his right to a fair trial.

The decision of the board of review is affirmed.

LATIMER, Judge (concurring):

I concur.

It was conceded in United States v. Littrice, 3 USCMA 487, 13 CMR 43, that the balance between ▐ discipline and justice in the military service was delicate. Here the facts and circumstances are more fairly embraced within the ambit of the former. But more than that, in this instance, the subject of command control was probed thoroughly by a voir dire examination. All the members of the court were questioned as to whether the publications would in any way affect their obligation to well and truly determine the issues between the Government and the accused. Each member who had any knowledge of the documents stated in substance that he understood his obligation as a member of the court and that he would not be influenced by the subject matter of the memoranda. It would take some evidence to the contrary before I would conclude they were concealing their true mental condition. Under my interpretation of the law, members of a court-martial are only disqualified for cause when they are influenced adversely toward an accused. The voir dire examination established that here they were not swayed by the policy declarations announced some five weeks prior to trial.

BROSMAN, Judge (dissenting):

I dissent from the views and action of my brothers in this case.

II

Although I filed a separate opinion in United States v. Littrice—here distin-

guished by the majority—it is to be observed that I concurred in Judge Latimer's opinion there without reserve, and not merely in the result reached by him. This means that I am bound as completely by that opinion's rationale and judicially relevant language as if I, myself, had served as the organ of the Court. Indeed—since the Chief Judge concurred in that case in result only—my agreement was an indispensable element of the process by which its rationale and its language became those of this tribunal, and thus reflected more than a mere expression of the views of a single judge.

Of course, this unqualified accord on my part embraced fully all aspects of the the opinion as to which the author spoke as a judge. That is to say, it included those holdings and other judicial pronouncements which pointed *away* from the specific judgment recorded, as well as those pointing *toward* and supporting it. In sum, I believed when I signed the opinion in Littrice, and I am as sure today, that it expressed a sanely balanced and soundly reasoned position with respect to the worrisome problem then and now before this Court.

III

These observations are supplied to serve as a backdrop to the expression of certain difficulties I have experienced in the present instance. Two distinctly dubious documents are involved in this case, both of which had been read by several members of the court-martial which tried the accused, and at least one of which had been read by all save one. The first of these is the letter from the Commanding General, United States Army, Europe, entitled "Retention of Thieves in the Army," and the second is the "Staff Judge Advocate Bulletin," prepared by the Staff Judge Advocate, First Infantry Division, and circulated to all officers and warrant officers of that command.

As to the first, it strikes me as being definitely arguable that there can be no sound distinction between the case at bar and the reversive *ratio* in Littrice. There is more than a little basis—it seems to me—for the suggestion that,

788

if we were right in Littrice, then the view of the majority must be wrong here. To put the matter more specifically—the argument would run—if it was prejudicial to the substantial rights of Littrice to have been tried by a court-martial to the members of which a "veiled threat" from command was read shortly before the formal hearing began, then it must also be deemed prejudicial to the accused in this case to have been tried by such a body a substantial number of the members of which similarly had been made aware of the identical menace through the use of other means.

It must not be left out of account, of course, that the selfsame language, contained in the selfsame letter, was involved in both cases. If the court in Littrice had been menaced by command through threats of adverse efficiency ratings in the event of "misbehavior," then why—it may be asked—had not the court here? If there was danger of intimidation through the use of minatory language in Littrice, then why not here? Are the *means* of communication really relevant in the present inquiry?

Now it is undeniable that there is a special sort of potential minacity implicit in the personal appearance by a representative of command before the membership of a court-martial prior to a hearing session, and for an "indoctrinative" purpose. This procedure in Littrice—given what was said—possessed an unmistakable point, which is wanting in the case before us now. Court members there almost certainly remembered the "reverse English" implicit in the reference to efficiency reports. However, *per se* there was nothing illegal in the appearance of Colonel Lutz before the Littrice court. See my separate opinion in the Littrice case. The harm, if any, arose solely from what he said and did. And in the instant case—be it noted—the identical things were said in the identical command letter. The only difference between the two is that there the letter was read to the court, whereas here it was perused in private by court-members.

Perhaps the challenged members of the present court had forgotten, or had overlooked in their reading, what in Littrice we characterized as the "veiled threat" the letter contained. Perhaps indeed they had done one of these things. But what if they had not? Can this possibly serve as the basis for distinction? Can we afford to speculate in this setting with propriety? It must be regarded as arguable respectively (1) that it cannot serve and (2) that we should not speculate. It does not strike me as unreasonable to suggest that if, say, X cannot be trusted to try an accused in the one case, then—if we are to be sure and the accused safe—we must say that he cannot in the other. At the moment, however, I am interested only in raising questions, and in seeking to measure the success of the majority's distinction. Just now I am not to be understood as expressing any sort of firm conclusion.

## IV

But another document was involved in the cause at bar—the division's "Staff Judge Advocate Bulletin." What of it? In an inquiring and experimental—not to say expansive—mood, let us seek to catalog some of its more unfortunate aspects, and to express certain of the more critical comments which in some sense, at least, may be thought justified.

At the outset it may be suggested that what the author of the "Bulletin" did comes perilously close to constituting—if it does not, in fact, do so—a formal and public censure, reprimand, or admonition of a "court or any member . . . thereof, with respect to the findings or sentence adjudged by the court, or with respect to any other exercise of its or his functions in the conduct of the proceeding," in violation of the Uniform Code, Article 37, 50 USC § 612. It will be recalled, in addition, that the terminal sentence of this Article reads as follows:

". . . No person subject to this code shall attempt to coerce or, by any unauthorized means, influence the action of a court-martial or any other military tribunal or any member thereof, in reaching the findings or sentence in any case, or the action of any convening, approving, or review-

ing authority with respect to his judicial acts."

It will also be remembered that the Code's Article 98, 50 USC § 692, provides that:

"Any person subject to this Code who—

• • • • • • •

"(2) knowingly and intentionally fails to enforce or comply with any provision of this Code regulating the proceedings before, during, or after trial of an accused;

shall be punished as a court-martial may direct."

To be sure Article 37 speaks specifically of the censure of a convening authority, but this is probably of no great importance. In any event, the question is not before us now—and it seems clear that conduct by a Staff Judge Advocate could violate the *spirit* of even the initial portion of the Article as much as that of, say, his division commander.

However this may be, the action of the Staff Judge Advocate here was certainly formal and public—for it was printed or otherwise reproduced mechanically, and it received widespread distribution. In addition it can only have resulted in a "censure, reprimand, or admonition"—within any usual meaning accorded these terms. Were the contents of the "Bulletin" directed at a "court or any member . . . thereof"? Well, the courts concerned were not identified by way of reference to a paragraph of Special Orders, nor were the cases selected as horrible examples described by the name of the fortunate accused persons. Likewise, the court members criticized were not enumerated, together with grade and serial number. The conclusion is inescapable, however, that any informed person within the command would know, and any curious one could learn, exactly which cases, which courts, and which officers had been singled out for overt disapprobation. All of this is discernible *almost* as clearly from those portions of the "Bulletin" set out in the majority opinion as from those not reported therein. This

790

much may be said without further extended quotation.

The net of all of this seems to be that the division's Staff Judge Advocate here had selected for public castigation the members of certain readily identifiable courts-martial, and had suggested through unavoidable inference that they did not perform their sworn duty. Almost certainly he did not hear the evidence in these cases, nor did he observe the demeanor of the witnesses. Moreover, he was not under oath to decide them according to his conscience, as the members of the court were. Yet, from the cold record, he has been willing to charge the officers concerned with bungling—and with little more reason than that, in the fullness of their quasijudicial responsibility, they chose to believe certain witnesses and to disbelieve others.

It will be noted that most of what has been said concerning the "Bulletin's" contents has been directed to the question of whether it constitutes a "censure." Whether it may be said as well to amount to an "attempt to coerce" is a further question—and one which is only raised.

It cannot be disputed that a convening authority is legally free to shift the membership of courts-martial at will, if he feels that trials within his command have resulted too frequently in acquittals or in inadequate sentences. He may rotate and substitute trial counsel, defense counsel and law officers to taste, and may, if he wishes, appoint courtsmartial composed of "hangmen" of established reputation. It is not suggested that any commander *does* these things. This is quite beside the point. The point is that he *may do so*—and for virtually any sort of purpose—with practical immunity within the framework of the present Code. It may, therefore, well be argued that these directive powers suffice for the maintenance of sound military discipline—and that this Court is in no way called on to sanction the dissemination of such "information" as is contained in the "Staff Judge Advocate Bulletin" here. Moreover, the argument to the effect that the task of agreeing on findings

and reaching a sentence is so complicated a business that the officers charged with its performance require substantial leadership from the convening authority or his staff judge advocate, should scarcely be extended to include the sort of "guidance" with which we are concerned in this branch of the case. This position, I think, may be urged without unreason.

I dare say that enough has been set down to suggest that the "Bulletin" is a distinctly questionable document. The fact that it—together with the command letter discussed earlier herein—had been read by a substantial proportion of the membership of the court which tried the accused, should give us serious ground for pause. Of course, I am not speaking here of any inquiry as to whether the author of the "Bulletin" was guilty of a violation of the Code—for we do not meet this problem in the instant case. Rather I have in mind the *risk of felt pressure* on the members of the court-martial which tried the accused.

## V

It is noted that this case reached us on questions relating to the challenge for cause of all members of the court-martial, save one. It is also to be observed that each challenged member asserted that his acquaintance with the contents of the command letter and those of the "Bulletin" would not operate to influence his action in deliberating on the findings and sentence. Under the provisions of the Manual applicable to a situation of this nature, "the challenge, if not withdrawn, must be passed on by the court [in the absence of the questioned member] after both sides have been given an opportunity to introduce evidence and to make an argument." Manual for Courts-Martial, United States, 1951, paragraph 62*h*(2).

Following the challenges in this case —and in keeping with the usual practice under the Manual—the remaining members of the court-martial passed thereon as to each one of their questioned fellows. That is to say, in the case of the first challenge, the member under scrutiny withdrew, and the remainder of the court voted not to sustain the objection for cause. Thereupon the supported member returned to the court and participated in deliberations on the propriety of the second challenge —and so on. In no case was the challenge for cause sustained. It is possible that no sort of objection can be taken to this procedure under the law, for it was in full accord with what are regarded—at least customarily—as the appropriate Manual requirements. In any event, it can scarcely be denied that the usage seems something less than satisfactory as a means for dealing with what virtually amounts to a challenge to the array—based, of course, on a single ground.

However this may be, it is my purpose here to deny expressly any intention to imply misconduct, concealment or want of integrity on the part of any court-martial member. All, I am sure, acted with complete honesty and sincerity during the vote on challenges, and I am equally certain that each spoke nothing less than the literal truth when he indicated his belief that he would not be influenced by the "veiled threat" contained in the dubious communications he had read. Lawyers will recognize immediately that an imputation of personal impropriety is not the point at all. The point, as I see it, simply is that, if there was want of safety in permitting the trial of Littrice by the court in that case for the reason that its members had been subjected to undue influence from command, then it is—or, at least, it may be—likewise unsafe to permit the trial of the present accused by the court-martial in this one. And this would be true whatever its members may honestly believe about the mental processes—conscious or unrecognized—they would utilize in reaching a decision.

## VI

Now that my brief role as devil's advocate has come to an end, I may speak my own mind. What do I genuinely propose should be done in the instant case? It has been mentioned earlier in these pages that two documents have required our attention:

The European command letter and the First Infantry Division's "Staff Judge Advocate Bulletin." My brothers have compartmentalized the general problem; have considered each paper apart from the other; and have concluded—it seems to me—that neither, standing alone, offered a fair risk of undue influence on the court-martial. They have distinguished Littrice—somewhat tenuously, it may be argued, and they have found the "Bulletin" to constitute a proper, if marginal, example of necessary indoctrination.

I, on the other hand, propose to follow a unitary approach—and, of course, this relieves me of the necessity for adopting a firm position as to either document, considered apart from its fellow. Thus I can concede—and I do—that a minimal distinction on their facts may be taken between Littrice and the case at bar. Thus, too, I can agree that, in a vacuum, the "Bulletin" need cause no acute concern. But when I join them, I cannot possibly go along—and I do not—with the notion that, viewed together, they do not present that fair risk of danger which requires reversal.

And let us not leave out of account their effect of dovetailing. The letter contains what in Littrice we were all willing to describe as a "veiled threat" regarding efficiency ratings. This document came from a higher military echelon, and was read by an appreciable number of court members. The "Bulletin" came from a subordinate command—what may be thought of as the "threat's" operating level. It, too, was read by a sizeable segment of the court, and it implemented the former paper by making it more than reasonably clear what might be regarded as "improper" behavior on the part of a court member. It will also be recalled that *both* communications had been read by what may fairly be called a substantial percentage of the tribunal's membership. Evaluated as a whole, how can we possibly say that the documentary situation did not offer at least a fair risk? And if such a risk exists, must we not demand that the accused be retried by a court as to which there will be no risk?

**792**

## VII

No one, I believe, is more understanding than I of the disciplinary problems and responsibilities of a military commander. Although I suspect that their onerous—their critical—quality is the subject of occasional exaggeration, it cannot be gainsaid that they are both unique and substantial. They should be considered sympathetically in this Court—and in general I believe they have been. Here, I suspect that too much of this noble quality is being extended. And this is not so much because of any views of my own, as it is because of Code and Manual provisions. For this reason, it has not been necessary that I consider what rule I would adopt as a lawmaker. These two sources—the Code and the Manual—have said that there are certain things that command may do in the administration of its disciplinary responsibilities and certain things it may not. Here—as in Littrice—I feel that command has simply overstepped the line, albeit perhaps unintentionally and doubtless with the best will in the world.

But—I am told—this approach to the present problem is unrealistic and administratively dangerous. What is to happen—the inquiry runs—if the Commanding General, First Infantry Division, has been so efficient in his distribution of the two papers before us that every officer within the command has seen them and read their contents? Who remains to try the accused? I am neither embarrassed by the question nor impressed by the argument. Assuming the likelihood of the situation suggested, it would follow from my views that other and somewhat more complicated arrangements for his trial will simply be required. If I am right as a judge in reaching the conclusion expressed in an earlier division of this opinion, then I cannot be wrong as an administrator in demanding that its practical consequences be faced and dealt with. If we were sound in Littrice—and if I am sound here—then we must not sacrifice the substantial rights of the accused to administrative convenience. Who indeed is willing to say that we should?

VIII

It follows from what has been said that, to my mind, prejudicial error resulted from holding not sustained the defense's challenges for cause as to those members of the court-martial who had read both documents involved in this case. Accordingly, I would reverse and direct a rehearing.