UNITED STATES, Appellee

v.

CHARLES J. NAVARRE, Jr., Private First Class,
U. S. Army, Appellant

5 USCMA 32, 17 CMR 32

No. 4175

Decided October 15, 1954

Maj Edwin Doran, U. S. Army, Capt William C. Irby, Jr., U. S. Army, and 1st Lt Leslie D. Scharf, U. S. Army, for Appellant.

Lt Col William R. Ward, U. S. Army, and 1st Lt Benjamin C. Flannagan, U. S. Army, for Appellee.

## Opinion of the Court

Robert E. Quinn, Chief Judge:

The accused was convicted by general court-martial of wrongfully using morphine, a habit-forming narcotic drug, in violation of Article 134, Uniform Code of Military Justice, 50 USC § 728. He was sentenced to dishonorable discharge, total forfeitures and confinement at hard labor for two years. The convening authority approved the find-

ings, but reduced the period of confinement to one year and suspended execution of the punitive discharge until the accused's release from confinement or completion of appellate review, whichever is the later date. This action was affirmed by a board of review, in the office of The Judge Advocate General of the Army. We granted the accused petition for review to determine the sufficiency of the evidence and the existence of command control.

In proof of the charge against the accused, Masao Mori, a Japanese police officer, testified that on the afternoon of April 21, 1953, he observed the accused in a Japanese home then under police surveillance. In front of him was a packet normally used as a narcotic container, and by his side was a used packet, twisted as if used and disposed of. Masao notified the Criminal Investigation Division, supplying that agency with a complete description of the accused. He then followed the accused after the latter's departure, but lost him on the crowded city streets. Later that day the policeman again met him in front of a railroad station, accompanied by a girl. The pair entered a nearby shop, but only the girl emerged. Later the accused was apprehended as he reentered the camp. Upon request of agents of the Criminal Investigation Division, he submitted a specimen of urine for analysis. This was forwarded to the 406th Medical General Laboratory. Analysis by a qualified toxicologist established the presence of morphine. The accused denied the use of morphine, and said that he was not in the Japanese home described by Masao, but had spent the day in the company of his fiancee completing plans for their wedding.

The conclusion that the specimen of urine contained morphine was based upon the Marquis, Frohde, and Mecke color reaction tests performed by Captain Dixon, Chief of the Toxicology Section of the Tokyo Laboratory. These tests were performed under the same conditions and by the same personnel as those in United States v. Ford, 4 USCMA 611, 16 CMR 185. For the reasons set out in that case, we held that the evidence of guilt was sufficient. In the case at bar, the evidence is considerably stronger. Here, the accused was found in an establishment known to traffic in drugs. He used evasive tactics to avoid a civilian policeman who sought only to keep him in sight until the arrival of American authorities. And, he neither produced his fiancee as a corroborative witness, nor did he explain his failure to do so. Under the circumstances, the issue of fact raised by the accused's denial of the use of narcotics appears to have been correctly resolved against him.

The facts upon which the second issue is framed were elicited by the defense counsel during the course of interrogation of the court members on *voir dire*. Complete understanding and proper disposition of the problem presented requires an extensive exposition of the matters developed in the trial forum. This interrogation indicated that three months prior to the date of this trial, Colonel Alford, the Commanding Officer of the Kokura General Depot, conducted a two-hour lecture on the subject of courts-martial for officers of his command. Among those in attendance were three officers who subsequently became members of the general court-martial appointed by the commanding officer, Southwestern Command, for trial of the instant case. When this fact appeared, the following colloquy took place:

"DEFENSE COUNSEL: You three gentlemen who were present, I want you to listen to a little story. I am going to ask you a question concerning it. A Commanding Officer of an installation had a lieutenant colonel call him on one occasion. This lieutenant colonel wanted to know why his efficiency report was rather low in one particular aspect, and the Commanding Officer proceeded to tell him that his efficiency report was low there because he had been a member of several court-martials. During those court-martials, the findings were, in some instances, not proper and, after the findings that were proper, in many instances, the sentences were not appropriate or proper. Did

34

you hear a story similar to that, Colonel Humphrey? .

COLONEL HUMPHREY: I did.

DEFENSE COUNSEL: Colonel Cuthbert?

COLONEL CUTHBERT: I did.

DEFENSE COUNSEL: Colonel Bagley?

COLONEL BAGLEY: I don't remember. I have heard stories about efficiency reports, but I don't remember them referring to court-martials.

DEFENSE COUNSEL: Do you recall it referring to court-martials. Colonel Humphrey?

COLONEL HUMPHREY: Yes.

DEFENSE COUNSEL: And you do, Colonel Cuthbert?

COLONEL CUTHBERT: Yes.

DEFENSE COUNSEL: You don't recall that it referred to a court-martial for the reason of one specific item on his efficiency report being low?

COLONEL BAGLEY: That is my remembrance.

DEFENSE COUNSEL: Now, Colonel Humphrey, in the little story I repeated to you, why did this lieutenant colonel's efficiency report suffer according to the story which I have just repeated?

COLONEL HUMPHREY: For the lack of exercising good judgment expected of an officer in the army.

DEFENSE COUNSEL: And whose opinion was it that he had failed to exercise good judgment in the story I told you?

COLONEL HUMPHREY: The Commanding Officer's—the rating officer.

DEFENSE COUNSEL: And you, Colonel Cuthbert, why did this individual's efficiency suffer?

COLONEL CUTHBERT: I think it was substantially as Colonel Humphrey has stated.

DEFENSE COUNSEL: And that was in the opinion of the Commanding Officer, is that correct?

COLONEL CUTHBERT: That is right.

DEFENSE COUNSEL: Now, in that little story or in normal court-martial activities, is the Commanding Officer usually present during these court-martials to hear the evidence? Colonel Humphrey.

COLONEL HUMPHREY: No. ·

DEFENSE COUNSEL: Colonel Cuthbert?

COLONEL CUTHBERT: Not normally.

.    .    .    .    .    .

DEFENSE COUNSEL: Then, Colonel Humphrey, then you stated that this man's efficiency report suffered because he failed to exercise good judgment. In your opinion, how would the Commanding Officer know whether that officer had exercised good judgment if he wasn't there to hear the witnesses, test their credibility, and to observe the accused. How would he know that the officer had failed to exercise good judgment?

COLONEL HUMPHREY: I do not know that. The statement was that the rating was low specifically due to action on court-martials. I do not believe it was such, and my statement was based on the lack of exercising good judgment and I should further state other actions because it is obvious that no officer is rated entirely on the work he does one or possibly two days out of a' month. That would be ridiculous to assume that.

DEFENSE COUNSEL: Let me ask you this, Colonel Humphrey. Is the Commanding Officer of any such individuals, regardless of whether he is an enlisted man or officer, entitled to base that efficiency report on that officer on his activities as a member of a court-martial?

COLONEL HUMPHREY: I believe so. I would say 'Yes,' and I would in rating an officer. I would consider the actions of an officer on a court, not to the extent, as I know you are referring, to give a reprimand, to admonish or specifically point out an action on a specific individual.

DEFENSE COUNSEL: But to hold a low efficiency report if he doesn't do what he thinks he should do, that is permissible you feel?

COLONEL HUMPHREY: No."

After further efforts of the defense to determine the purpose of Colonel Alford's parable and its effect upon the members in question were made, Colonel Cuthbert, one of the officers inter-

rogated, interrupted the examiner, and the following occurred:

"COLONEL CUTHBERT: I think you should get the whole background. As long as you have introduced the subject, I would like to tell the whole background.

DEFENSE COUNSEL: I would be glad to hear it and also, if the court will permit, I would like to call Colonel Alford to tell why he told the story to the various members of this post. I understand that Congress is very interested and has called the judges of the Court of Military Appeals before them to tell whether the Commanding Officers were exercising undue influence over the court members. I would like to help Congress and the Court of Military Appeals. I would like to call Colonel Alford in to have him tell his story and I will also be glad to have the court members tell the story. If the court will permit Colonel Alford to be called, I will be glad to have you do so. I will let him repeat his lecture for the record.

LAW OFFICER: Very well. Let Colonel Cuthbert relate the story.

COLONEL CUTHBERT: This was a general meeting in which the general duties of members of the courts were discussed and in the course of that discussion Colonel Alford presented to the group of officers assembled statistics dealing with special courts, particularly, that had been tried in this court in this camp over the period of about the last year. Those statistics were very interesting in that they showed a very high percentage of convictions by special courts of privates that had been brought before it to be tried with maximum sentences almost throughout whereas, it showed that as a man progressed in rank—and these were statistics—his chances of being found guilty of any offense decreased with his rank and that the sentences decreased with rank so that you could come to the only conclusion that the courts were apparently of the opinion that anyone who acquires stripes could do no wrong and that they were of the opinion that anyone who was

a private must, of necessity, be guilty and be wrong and this story to which you are referring was in connection with that and Colonel Alford was—very specifically made the point —The point he was trying to drive home was that it is a man's duty to do a duty as he sees fit and not the fact that he may have achieved rank and may have many other things, but to find him guilty on the facts presented in court and I think that that is in conformity with the Manual for Courts-Martial.

DEFENSE COUNSEL: But the story was told about a man's efficiency suffering for his court-martial activities, was it not?

COLONEL CUTHBERT: There was a story of that nature; the exact statement or how it was phrased I cannot remember.

DEFENSE COUNSEL: Now, based on what you have stated there, Colonel, let me ask you this: We try a master sergeant today. This is a hypothetical question. And we also try a private. They both get six months' confinement and two-thirds of his pay. Who has been more severely punished—both being tried for the same offense?

COLONEL CUTHBERT: The master sergeant.

DEFENSE COUNSEL: They both got the maximum, didn't they?

COLONEL CUTHBERT: As a matter of loss of grade. However, if you check the statistics of the special court-martials in Kokura, you will find that the master sergeant was fined about $20.

.    .    .    .    .    .

COLONEL HUMPHREY: The question has been answered. I will repeat it again for the record. I am a regular army officer. I am a major in the regular army and to be questioned to this extent, I consider it to be irregular.

DEFENSE COUNSEL: Well, do you have anything further to say, Colonel?

COLONEL HUMPHREY: No, I have taken the oath.

DEFENSE COUNSEL: I understand that you might consider it irregular

and, Colonel, if I was a regular army officer remaining in the army I wouldn't question you this way or any other officer because the next time I appear before you, you will be trying me instead of the accused. However, I am lacking five months of being a civilian. I feel that in many instances the Commanding Officers have taken undue prerogatives in talking with court members and for that reason I have questioned you because you said you were present. I will do any court that way in which I am charged as defense counsel. I am sorry if you are offended. Believe me, I will not carry it outside of the courtroom. Believe me, even if you were offended, I would do it again if I was called upon to defend any accused in which a question of undue influence on the part of the Commanding Officer might arise."

At the conclusion of the *voir dire* examination each of the court members concerned disclaimed any improper motivation. Moreover, each declared that he was prepared to decide the instant case solely upon the evidence presented, as required by his oath, and without regard to the presumed desires of his commanding officer. Thereupon, the defense counsel announced that the accused did not desire to challenge any member either for cause or peremptorily.

The appellate defense counsel now characterize the court-martial lecture conducted by Colonel Alford as an exercise of unlawful command influence, effectively depriving the accused of a fair trial.

The history of unlawful command influence, and the importance attaching to it in the congressional hearings on the Uniform Code of Military Justice, were fully expounded by this Court in United States v. Littrice, 3 USCMA 487, 13 CMR 43. We there discussed the dual purpose of Article 37 of the Code, supra, 50 USC § 612, and pointed out that it was designed to preserve the integrity of military courts without unduly restricting those responsible for the conduct of our military operations. That Article prohibits a convening authority, or other commanding officers, from censuring, reprimanding, or admonishing a court, or members thereof, because of the findings or sentence adjudged. It further proscribes coercing or otherwise influencing a court-martial member by any unauthorized means. Needless to say, this provision of the Code purports to assure to all in the military service an absolutely fair trial in which the findings and sentence are determined solely upon the evidence, and free from all unlawful influence exerted by any military superior. United States v. Isbell, 3 USCMA 782, 14 CMR 200.

Allegations of unlawful influence stem most frequently from pretrial instructions imparted by military commanders or their legal advisers. Recognizing the danger that either the language or the motive of an instructor may be misconstrued, civilian appellate courts generally caution against their use in civilian courts. Williams v. State, 89 Tex Cr 334, 231 SW 110; Thomas v. State, 97 Tex Cr 432, 262 SW 84; People v. Fisher, 340 Ill 216, 172 NE 743. However, the requirements of the military prohibit their complete eradication, and the Manual for Courts-Martial, United States, 1951, paragraph 38, expressly authorizes their use under proper circumstances. Justification for the thorough indoctrination of military personnel in the substantive and procedural provisions of the Code and the Manual is readily apparent. Members of commands exercising inferior courts-martial jurisdiction are required to conduct the proceedings of such tribunals without the guidance of a law officer or others skilled in military law. United States v. Isbell, supra; cf. United States v. Pulliam, 3 USCMA 95, 11 CMR 95. Moreover, the sentence procedures of general courts-martial involve the application of the complicated provisions of the Manual, normally without special instructions from the law officer. United States v. Isbell, supra. Forbidding or needlessly curtailing lectures designed to prepare prospective court members for the proper discharge of their important functions would approximate setting a ship adrift without a rudder. Indeed, circumstances may well

**37**

dictate the need for additional instructions when deficiencies on the part of court-martial members become apparent. But, as we cautioned in United States v. Isbell, supra:

> "The steps taken by a commanding officer to correct deficiencies, however, must be limited to *instructions,* and should not extend to any action amounting to censure, reprimand, or admonition of the court."

In the case at bar the necessity for additional instructions in military justice was clearly dictated by the statistics compiled by Colonel Alford. These figures demonstrated beyond question that special courts-martial were guided to their conclusion of guilt or innocence solely by considerations of rank. In the matter of severity of sentence, as well, this same idea played its evil role. Confronted by these clear indications, the commanding officer was compelled to take affirmative action to preserve the morale of his organization as well as its discipline. In his lecture condemning this, he made no reference to any particular court, or any particular case. His single concern was with the effect of rank upon the findings and the sentence. His reference to efficiency reports was predicated wholly upon an individual's failure to be governed by the guiding norm of our system—Equal Justice Under Law. Viewed in their entirety, his comments on this occasion were in no way incompatible with the requirement of an absolutely fair trial for this accused. A contrary conclusion requires the isolation of the parable employed by Colonel Alford and its consideration wholly out of the context in which it was used.

The decision of the board of review is affirmed.

LATIMER, Judge (concurring with the Chief Judge):

I concur with the Chief Judge.

This is a perfect case of waiver of the disqualification of court members, but I need not dwell on that issue. It is admitted by all members of the Court that there is ample evidence to establish the offense charged, so the only question before us is whether the accused received a fair and just trial by a court-martial uninfluenced by command control. I join the Chief Judge in his views that that vice is not shown by this record. However, I desire to make one short observation to further support my position. When a commander who is responsible for discipline determines, from his review of court-martial records, that justice in his command is not being administered equally, he is duty-bound to take action. Here, some three months prior to this trial, this commander assembled all of his officers for a two-hour course of instruction on military justice because of apparent injustices. Without dwelling on any particular case, he lectured them on the fundamental rule of law that all servicemen are entitled to equal protection before the court-martial, regardless of rank. His principal complaint was that the lowest ranking enlisted man was being discriminated against and preference in findings and sentences was being given to officers and senior noncommissioned officers. By the use of a parable he advanced his policy of making an appropriate notation on the efficiency report of an officer who failed to carry out his responsibility by administering the law inequitably or in any other manner contrary to the Code. Any commander worth his salt would do the same and he should not be restrained from informing the officers of his command of his intent to downgrade those individuals who violated the spirit and intent of the law. Assuming, arguendo, the parable was in essence a veiled threat, it did not deny this private a fair trial. On the contrary, if it had any effect on his case, it would insure him the same treatment accorded all other members of the command from the highes commissioned officer to the lowest private. I cannot find fault with a commander who seeks to bring about that result. Rather than criticize him, I would offer him a commendation.

BROSMAN, Judge (concurring in part and dissenting in part):

I fully agree that the findings of guilty here were based on ample evidence.

## II

To my mind, however, my brothers have glossed over a flagrant attempt to exercise "command influ- ■■■■■■ ■ ence" with resultant serious risk to the integrity of the court-martial's action in the case at bar. This may best be demonstrated, I believe, through a careful reading of approximately the first one-third of the extensive quotation from the record of trial set out in an early part of the principal opinion.

The language in which I am particularly interested was used during a *voir dire* colloquy held chiefly between the defense counsel and Lieutenant Colonel Clarence T. Cuthbert, a member of the court. It should be said that prior testimony had indicated that, shortly before the present trial, three members of the tribunal which tried Navarre had attended a "court-martial school" addressed by Colonel Roy A. Alford, head of the Kokura General Depot, and the commanding officer of the court members concerned. After animadverting on the previous specific "misconduct" of past courts-martial with respect to both findings and sentences, it appears that Colonel Alford offered an illustrative—and somewhat pointed—anecdote involving a court-martial member and an unidentified commanding officer from whom the former had received an unflattering efficiency report rating. It was to this parable that defense counsel referred when he mentioned the "little story," which might aptly have been entitled "The Fable of the Luckless Lieutenant Colonel and the Low Efficiency Report."

## III

In United States v. Littrice, cited in the principal opinion, we directed a rehearing because of certain command comments addressed to the members of a court-martial, which remarks contained a reference to efficiency reports. There we denounced unqualifiedly the mention of efficiency ratings as a "veiled threat" and pointed out that "immediately preceding the reference to efficiency report entries is a criticism of the sentences imposed by prior courts-martial." In addition, Judge Latimer,

in speaking for a united Court, aptly observed that:

" . . . Courts-martial are manned by officers whose opportunities for advancement and promotion are controlled largely by their commanding officers and it is no reflection on their honesty and integrity to conclude that they desire to make a fine record. When an officer is lectured on the policy of his commander and then told that if he performs his duties as a member of a courts-martial outstandingly, his record will reflect a high standard of performance, he is apt to be influenced to take action which might be highly regarded by the commander. At least he has more mental reservation than has an officer who has not been subjected to the influence of suggestion."

True it is that the "instructions" with which we are concerned here were expressed more than two months prior to the trial of the instant case, whereas in Littrice the challenged conference took place not long before the trial. I considered a similar difference between two cases in my separate opinion in United States v. Isbell, also cited in the principal opinion. There I said:

"Perhaps the challenged members of the present court had forgotten . . . what in Littrice we characterized as . . . [a] 'veiled threat' . . . But what if they had not? Can this possibly serve as the basis for distinction? Can we afford to speculate in this setting with propriety? It must be regarded as arguable respectively (1) that it cannot serve and (2) that we should not speculate. It does not strike me as unreasonable to suggest that if, say, $X$ cannot be trusted to try an accused in the one case, then—if we are to be sure and the accused safe—we must say that he cannot in the other."

So far as I am concerned—and quite without regard to whether Colonel Alford felt "compelled to take affirmative action to preserve the morale of his organization as well as its discipline"— unlawful "command control" was attempted here. In doing what he conceivably could have done properly, the

**39**

Depot commander simply went too far. And because of this he ran afoul of the Code and the Manual. Our delicate problem in these so-called "command control" cases was well stated by Judge Latimer in his opinion in the Littrice case. There he said:

" . . . The difficult test in this case is in determining whether the instructions given to the members of the court-martial unnecessarily impinged on the right of the accused to have his case heard by a court-martial unprompted by authority. Posed in a slightly different manner the question is: Did the instructions given by the acting commanding officer fall within the fair limits permitted by the Manual or were they of such a coercive nature that there was a violation of the Code restriction against the exercise of improper influence upon the court-martial members?"

In my view, Colonel Alford's "instructions" distinctly *did* impinge on the court-martial's function and *did* fall well without "the fair limits permitted by the Manual"—and, of course, the Code as well. Practices of this sort are downright dangerous to the spirit of the current dispensation, and this Court labors under no duty to speculate the proceedings of a court-martial into respectability.[1]

---

[1] I am somewhat disturbed by the accolades—the "commendation"—my brothers propose for Colonel Alford. This is not to say that I am at all opposed to the ideal of equal justice for members of the military service regardless of rank. Indeed, to foster that very conception of justice I propose merely that one subject to the Uniform Code be tried and—if found guilty—sentenced only in accord with the evidence heard by the members of the court-martial and the independent judgment of those members after hearing that evidence. That precept I find violated by my brothers' views.

An identical sentence for every accused regardless of rank—which ·in practice, as opposed to theory, generally gravitates.in the direction of the maximum for the offense—is not *always* equal justice. Defense counsel in the instant case effectively made this point in the court of his *voir dire* examination. Adapting the example he used, I shall assume that a master sergeant and a private first class are each tried by a special court-martial for routine failures to go to an appointed place of duty, in violation of Article 86 of the Uniform Code, 50 USC § 680.· An identical sentence of reduction to the lowest enlisted grade would not at all connote similarity of result. The private first class would be losing that which he might regain in a few months; the master sergeant would be losing that which would take years to reacquire. In a typical case the master sergeant—who might well have several persons dependent on him—would be reduced in pay scale from $206.00 to $91.00 monthly.

The private first class would be reduced from $107.00 per month to $91.00. It may be argued, of course, that the master sergeant merited greater punishment because he enjoyed greater responsibility. But this decision, I think, the court members, who hear the evidence, should make—*not* the convening authority.

Even if the approach commended so highly by my brothers be applied to findings, its inadequacy is also apparent. It is generally assumed that, in the usual instance, high military grade reflects the efficient performance of military duties, and at least a passable character during an extended period of service. Thus, in military law "evidence of military record and standing" is always admissible to create an inference of innocence. Manual for Courts-Martial, United States, 1951, paragraph 138*f*(2). It therefore stands to reason that in many instances a master sergeant will be the better able to produce evidence of good character than a mere private. Thus, if evidence of good character has its permissible effect on the members of a court-martial, is it not probable that the varying availability of such evidence may ultimately reflect itself in the findings? This is not to say that, as a general proposition, a master sergeant possesses a better character than a private; it simply means that the former is frequently more favorably situated with respect to the production of convincing character evidence for use before a court-martial. Thus, a lack of uniformity in findings may sometimes reflect no more than the inherent inequities in the rule that evidence of good character is admissible—

## IV

It is to be observed that Colonel Cuthbert, Colonel Bagley and Colonel Humphrey—the three court members who had attended the questionable "court-martial school"—all denied that they would be influenced in this, or any other case, by Colonel Alford's efficiency report menaces. I am sure that each was genuinely convinced that he would perform *his* duties properly and in accordance with his oath—and felt that the only deficiency he need worry about was the possible "lack of exercising good judgment expected of an officer in the Army," as one of them put it. Each was confident that *he* would not be guilty of misconduct so gross—and, therefore, that Colonel Alford's parable had nothing to do with him.

The difficulty with this is, however, that the Colonel's not unpurposeful anecdote may well have served to start the minds of court members running in a reprehended channel—that is, they may have begun to think of their commanding officer's views and the results *he* desired. Also they could well have thought of their personal fates as being bound up in some measure with the outcome of specific litigation. I am certain that this influence, if any, would have been unconscious—but as has been pointed out judicially in cases of, say, jury tampering, it is often impossible for one to recognize the impact of an idea or an incident on one's own mind. It has been said that "the devil himself knoweth not the mind of man"—and it may be added with assurance that man himself on occasion knows little more about the matter.

In the area of "command control" Congress was rightly concerned not only with conscious and recognizable influences, but with unconscious ones as well. A civilian juror is without any sort of worry on the score of efficiency reports, or anything remotely like them. Congress manifestly desired for the court-martial member—the military juror—a similar freedom. Colonel Alford impinged on that freedom—and reversal is required. Indeed, this result seems the only one consistent with this Court's unanimous action in Littrice.

---

and no one, so far as I know, has suggested that this rule be abolished, although it may well operate to benefit a master sergeant more frequently than a private.

Furthermore, high rank after long military service bespeaks a satisfactory adjustment to military life—one not made by all who wear the uniform. Rehabilitation prospects for one holding such rank would, therefore, often appear to be better than for another convicted of the same offense, but lacking a past record of satisfactory military adjustment—or perhaps even with a record of unsatisfactory adjustment. These differences, too, may reflect themselves in a court-martial sentence.

In addition to rehabilitation possibilities, it is quite likely that one with a certain amount of military grade—and therefore usually equipped with military skills and experience—may be of greater value to the Armed Forces than one wanting in such experience. Conceivably there is here an element of unfairness to the individual who lacks skill, often with no fault on his part. Yet the circumstance of value to the military service is, I am sure, one which has been traditionally considered by courts-martial in assessing sentences—and I find no pronouncement either in the Code or the Manual that this factor is no longer to be considered. In fact, in a combat situation where men are sorely needed, I would greatly doubt the feasibility—perhaps even the wisdom—of attempting to rule this consideration out of the court's mind.

My fear is that Colonel Alford sought to oversimplify something which cannot properly be simplified—and which was not intended by Congress to be simplified. Sentencing is a highly complex matter, and it cannot conceivably have been within the legislative intendment that it be handled by rule of thumb. In fact, neither Congress nor the President has provided a *minimum* sentence, save for a few especially grave offenses. Yet henceforth a convening authority, under the guise of an attempt to promote uniformity of sentence, can place court-martial members in an extremely narrow box. And should they seek to escape, he can "downgrade" them back into it—and terminate the tour with a "commendation" for having done so! Is this safe doctrine?

**41**

## V

It may be suggested that waiver plays a part in the drama of this case. The transcript makes abundantly clear to me, however, that there can have been no waiver here in the sense required by military law in this sort of case—this despite the fact that no express challenge, either peremptory or for cause, was entered by the defense against any member of the court-martial. Of course, I cannot know why Captain Bush, the defense counsel, followed the course he chose. I can be sure, however, that he did *not* desire to transmit a full account of Colonel Alford's wishes and purposes in the premises—known previously to only a part—to all members of the court-martial trying his client, and thereafter to do nothing about the situation. It may have been that his decision not to challenge was based on some general notion that, by means of the action he took, he could fully protect the interests of Navarre, and at the same time serve the value of tact in the local scene. Or he may have been moved by a belief that the entire "panel" was in a large sense disqualified, and thus that he was confronted by the difficulty this Court adverted to in United States v. Adamiak, 4 USCMA 412, 15 CMR 412. Particularly if this latter was the foundation for his election, I would be inclined to question both his tactic and the premise on which it was founded. But all of this is none of my business. My job is to determine whether he meant to *waive*—and I am certain that he did not.

This is strongly suggested by the following comment of defense counsel found on page 10 of the record:

"DEFENSE COUNSEL: I would be glad to hear it and also, if the court will permit, I would like to call Colonel Alford to tell why he told the story to the various members of this post. I understand that Congress is very interested and has called the judges of the Court of Military Appeals before them to tell whether the Commanding Officers were exercising undue influence over the court members. I would like to help Congress and the Court of Military Appeals. I would like to call Colonel Alford in to have him tell his story and I will also be glad to have the court members tell the story. If the court will permit Colonel Alford to be called, I will be glad to have you do so. I will let him repeat his lecture for the record."

And also by the following colloquy between defense counsel and Lieutenant Colonel Clarence L. Humphrey, a court member, found on pages 11 and 12 of the transcript.

"COLONEL HUMPHREY: The question has been answered. I will repeat it again for the record. I am a regular army officer. I am a major in the regular army and to be questioned to this extent, I consider it to be irregular.

"DEFENSE COUNSEL: Well, do you have anything further to say, Colonel?

"COLONEL HUMPHREY: No, I have taken the oath.

"DEFENSE COUNSEL: I understand that you might consider it irregular and, Colonel, if I was a regular army officer remaining in the Army I wouldn't question you this way or any other officer because the next time I appear before you, you will be trying me instead of the accused. However, I am lacking five months of being a civilian. I feel that in many instances the Commanding Officers have taken undue prerogatives in talking with court members and for that reason I have questioned you because you said you were present. I will do any court that way in which I am charged as defense counsel. I am sorry if you are offended. Believe me, I will not carry it outside of the courtroom. Believe me, even if you were offended, I would do it again if I was called upon to defend any accused in which a question of undue influence on the part of the Commanding Officer might arise."

To my mind these two passages convincingly shatter any contention that the accused's assigned military counsel chose to waive his right to preserve for

the consideration of the board of review and this Court the dubious and unhealthy matters he brough out on *voir dire*. He may well have made use of an inartificial—a suggestive and circuitous, rather than a direct—means of accomplishing his objective. However, in my opinion, his conduct was distinctly characterized by a special purpose, and he intended a result antithetically opposed to waiver. Of course, if we are to take the unyielding position that, in a setting of this sort, an accused simply waives in the absence of challenge, then that is the end of the matter. However, I am unwilling to take this position.

Much more might be offered in explanation of Captain Bush's tactics but —in view of the reasons relied on by the majority—I have no wish to labor the matter. Suffice it to say that we are here engaged in no game in which defense counsel is the player and the accused a pawn. Instead, we are dealing with a problem of such overwhelming importance in the scheme of military justice that it may be said to lie at the very core of the Code. It is my profound conviction indeed that, in the absence of this problem, literally there would have been no Uniform Code of Military Justice and no Court of Military Appeals. Does it not follow then that, save in the clearest cases, we must not permit ourselves to be insulated from its consideration?

Had this cause been tried in a civilian criminal court, the trial judge— had he deemed appropriate—might lawfully have excused the three questionable jurors of his own motion. Indeed —granting that the present is a proper case—he would doubtless have received the castigation of an appellate court had he failed to do so. To say the least, there is distinct uncertainty in military law administration concerning the exercise of this important power and function. Who in a court-martial—that is, what element of the body—is responsible for the supervision of its integrity, more specifically of the qualifications of its "jurors"? In the answer to this inquiry, I believe I find substantial support for the position I urge here. Is

the law officer so responsible? Could he of his own motion have excused the three officers here? I cannot find that he has been given this power—certainly in this sort of case. Does the responsibility rest in the membership of the court-martial itself? In many cases— yea, the present one—this particular reed is frail indeed, for it will be noted here that the qualifications of *three* members of a court of *five* have been questioned. Can it be with the convening authority? Not so far as "command control" questions are concerned, I am sure, for in this area he is more often than not allegedly the villain of the piece. Perhaps it lies with the upper appellate agencies of the military justice system to assume this demanding role.

We are concerned here with much more, I believe, than the protection of an accused person named Navarre. In United States v. Walters, 4 USCMA 617, 16 CMR 191, this Court said:

" . . . In addition to the specific prohibitions, and other regulations, set forth in the Manual for Courts-Martial and in the Uniform Code, there exist certain basic principals which underlie the conduct of trials by court-martial—or any other sort of tribunal. Not the least of these is that the court's actions and deliberations must not only be untainted, but must also avoid the very appearance of impurity. Cf. United States v. Johnson, 318 US 189, 87 L ed 704, 63 S Ct 549; United States v. Atkinson, 297 US 157, 80 L ed 555, 56 S Ct 391; Ryan v. United States, supra. When such an unhappy appearance is present, proper judicial administration often requires reversive action."

A judicial system operates effectively only with public confidence—and, naturally, this trust exists only if there also exists a belief that triers of fact act fairly and without undue influence. Regardless of the merits, what general confidence is likely to be reposed in findings of guilty returned by a court-martial three of whose five members have been subjected to threats—and with ef-

**43**

fective teeth—of reprisals unless more accused persons are convicted and severer sentences imposed?

## VI

It must follow that I would reverse the decision of the board of review here and direct a rehearing.