UNITED STATES, Appellee

v

GLENN L. McCANN, Master Sergeant, U. S. Air Force, Appellant

8 USCMA 675, 25 CMR 179

No. 9454

Decided February 14, 1958

*Captain Richard C. Bocken* argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Ellis L. Gottlieb* and *Lieutenant Colonel Stanley S. Butt.*

*Major Fred C. Vowell* argued the cause for Appellee, United States. With him on the brief was *Lieutenant Colonel Francis P. Murray.*

## Opinion of the Court

ROBERT E. QUINN, Chief Judge:

A number of claims of error are alleged. Only one need be mentioned.

The accused was charged with being drunk on duty, in violation of Article 112, and with the operation of a Ground Control Approach facility while drunk and in such a reckless manner as to endanger life and property, in violation of Article 134, Uniform Code of Military Justice, 10 USC §§ 912 and 934, respectively. The trial began on April 5, 1956, and continued until April 11, 1956. On April 9, several members of the court-martial attended a lecture on military justice given by the staff judge advocate. In his talk, the staff judge advocate discussed certain acts of misconduct which he characterized as being more reprehensible in the military than in the civilian community. One of the acts cited was that of a Ground Control Approach operator incapacitating himself for duty by the use of intoxicants.

The "justice" lecture clearly constituted an improper influence upon the court members in regard to a case upon which they were then sitting. Under the circumstances, reversal of the accused's conviction is required. United States v Zagar, 5 USCMA 410, 18 CMR 34; see also United States v Harris, 8 USCMA 199, 24 CMR 9; United States v Dean, 5 USCMA 44, 17 CMR 44.

The findings of guilty and the sentence are set aside. A rehearing may be ordered.

Judge FERGUSON concurs.

LATIMER, Judge (dissenting):

I dissent.

There are two fundamental objections which I raise to the majority opinion. The first is that two very important questions involving the admissibility of evidence are not discussed, even though the questions are bound to arise on a rehearing. The second is that the conviction is reversed for an incident which, in the background of this case, is trifling. I shall present my views on each question in a reverse order, although I realize that my development of the law on the use of body fluids is theoretical and not expected to convince my associates to express their views.

II

This trial began on April 5, 1956. The accused had been arraigned but had not as yet pleaded when the defense requested a continuance. A continuance until April 11, 1956, was granted. The lecture which my associates characterize as command control was given on April 9, 1956. The first presentation of the subject had been given some two weeks earlier, but some 400 officers, warrant officers, and master sergeants had been unable to attend at that time, and this lecture was a follow-up for those who were absent on the first occasion. In the course of his address, the speaker sought to emphasize that in the military service certain acts are more serious than they would be in civilian life. He alluded to the following as examples: Absence from duty, breach of restriction, escape from confinement, and the operation of a Ground Control Approach facility by one who has incapacitated himself for duty because of the use of intoxicants. When the court reconvened, the members were examined exhaustively on the effect of the lecture and each under oath vowed it did not, and would not, influence them. In spite of their assurances, it is the asserted impact of reference to this last offense in the series of illustrations which brings about this reversal.

The error was asserted before a board of review, and it found that the lecture

676

was not directed to the members of the court as such; that the reference to the operator was only a passing comment in a series of comparisons; and that on voir dire examination, at which time the court members were interrogated on the lecture, it was brought out that those who were in attendance were not impressed with or influenced by the remark and they would decide the case strictly on its merits. For the foregoing reasons, the board of review decided that the accused's rights were not prejudiced.

The staff judge advocate's review in this case was the work of a successor in office to the staff judge advocate who delivered the lecture. The following excerpt from it places the issue in its proper perspective:

". . . It is also uncontroverted that the lecturer, to illustrate his point, adverted to the case of the accused. Except for the passing reference to this case, there is no doubt that the lecturer was discharging a proper function not in contravention of the Uniform Code of Military Justice, Article 37. The military justice lectures were given by directive of the Commander, Technical Training Air Force, dated 10 February 1956, because of an apparent 'need to instill in our commissioned and senior noncommissioned officers a more thorough and comprehensive understanding of the principles of military justice and the court-martial processes,' and save for the unfortunate reference to this case, was a proper indoctrination of the attending personnel in the provisions of the Code and the Manual for Courts-Martial."

Paragraph 38, Manual for Courts-Martial, United States, 1951, provides:

"A convening authority may, through his staff judge advocate . . . give general instruction to the personnel of a court-martial which he has appointed. . . . the prevalence of offenses which have impaired efficiency and discipline, and of command measures which have been taken to prevent offenses. . . . the convening authority may not, however, directly or indirectly give instruction to, or otherwise unlawfully influence, a court as to its future action in a particular case."

For reasons which will hereinafter appear, I believe the previous reviews reach the correct result. ▆▆▆▆▆ ▆ The lecture series as conceived and carried out by the convening authority was in keeping with the standards of paragraph 38, supra, and it is a mere happenstance that it was presented while this case was in the process of being tried. There is not the slightest hint that any commander sought to influence the outcome of this case. Defense counsel probably attended one of the lectures but, in all events, he knew of the last meeting, for he called for a voir dire of the court members upon reconvention of the court. In their testimony under oath they stated they were uninfluenced by what is termed in the defense appellate brief "the subtle hint" of the staff judge advocate. However, in United States v Zagar, 5 USCMA 410, 18 CMR 34, this Court, divided on the effect of the voir dire, announced the following principle which furnishes whatever reason there may be to support the majority holding in the case at bar:

"Government appellate counsel have insisted that, in judging the validity of the court's action, we are bound by the insistence of each member of the court-martial that he would not be influenced in any degree by the statements of Colonel Chuck, the Staff Judge Advocate. We must reject this view at once, for—although we entertain no doubt of the complete sincerity of the officers concerned— we recognize the present applicability of the comment that 'jurors are human and not always conscious to what extent they are in fact biased or prejudiced and their inward sentiments can not always be ascertained.' See Stone v. United States, 113 F 2d 70 (CA 6th Cir). Accord: United States v. Adamiak, 4 USCMA 412, 15 CMR 412; United States v. Rakes, 74 F Supp 645 (ED Va)."

I dissented, stating:

". . . As I view this record there

is only one legal question involved and that is, was the accused denied a trial by a fair and impartial court-martial? I conclude he was not, and in arriving at my conclusion I am willing to rely on the sworn testimony of each officer on *voir dire* that the orientation lecture would not influence him, in any manner, in reaching a fair and just finding and sentence based solely on the evidence adduced and the instructions given by the law officer at the trial. Where, as in those cases cited by my associates, an attempt has been made to bribe a juror and the matter is paraded before the entire panel, whether the impact on any given juror can be self-assessed need not now be determined. But, unless a statement of a juror under oath that he has no fixed opinion on the guilt or innocence of an accused, and that he will decide the case on the evidence and the instructions of the judge, is accepted as worthy of belief, then all trial courts might just as well cast out *voir dire* of jurors. Those were my views in United States v. Isbell, 3 USCMA 782, 14 CMR 200, and they remain unchanged. It may be, as my associates seem to hold, that appellate judges can better determine the mental state of a court-martial member, than can the member, but I would conclude otherwise."

Each case must be determined on its relevant facts, and I find a great deal of difference between *Zagar* and the case at bar. Some of the salient distinctions rendering the rule of that case inapplicable here are these: There, the speaker stated that it was "highly probable that one brought to trial before a court-martial is guilty of the offense charged." That was a comment on the probable guilt of the accused. In this instance, there is not even an innuendo on guilt or innocence. In that case, the subjects of discussion were controversial and questionable. Here the comment was so self-evident that common sense dictates the conclusion even without it ever having been mentioned. If any officer or enlisted man in the Air Force does not know the seriousness of a drunken operator controlling the land-

ing approach of aircraft, then I overestimate the mental capacity of those who man that Service. I am certain they know, as does every one else who appreciates the danger to the lives of those who must fly in all sorts of weather. If using a truism for illustrative purposes is error, then members of the military services should never be told that the crimes are serious. Furthermore, in *Zagar*, the majority of the Court attacked the timing of the lecture, stating that it appeared that the lecture had been "beamed solely to members of the newly appointed court-martial chosen to try the . . . case." Here, on the contrary, there can be no such argument. There is no indication that the court was newly appointed or convened to try this particular case. In addition, as already mentioned, the lecture was a make-up for four hundred or so men. Unfortunately, in the audience were some of the members of this court-martial, but that just happened because they had been unable to attend a lecture, topically the same, which had been delivered previously by the staff judge advocate. In *Zagar*, on the other hand, all the court members attended the lecture and comprised the staff judge advocate's only audience. Certainly, no member of this court-martial would have an imagination fertile enough to suspect that the conference was called to impress them with the necessity of leaving their impartial role of triers of facts.

These matters of distinction point up the manifest necessity of not always applying the rule that we may not rely on court members' assessment of the impact upon them of a staff judge advocate's lecture. I know not why an officer cannot evaluate his own mental freedom to weigh the evidence in a proper manner, and I am unwilling to impute to him intellectual dishonesty. Consequently, in this case I dissent with a strong conviction that the accused was not denied a fair and impartial trial because of command influence.

III

The majority reverses and authorizes a rehearing, but they fail to furnish enlightenment on the admissibility of cer-

tain evidence to those who must retry this case. It is an obscurantist tactic to neglect answering questions which will inevitably arise again to haunt us. It stands to reason that upon a rehearing the same evidence will be proffered and the correctness of the law officer's rulings on admissibility questioned once again. Thus, we pave the way for a possible third hearing of this case, and that interminable prospect prompts me to express my views upon remaining issues.

As the majority has stated, the accused was charged with and convicted of being drunk on duty and with recklessly operating a ground control approach facility while drunk and in such a manner as to endanger life and property. At the time of the alleged offenses, he was on duty as a shift supervisor of a radar station at an Air Force base landing field. A pilot using a ground control approach must be homed to a safe landing by radioed direction from a controller observing the aircraft through a radar set. The accused had the responsibility on this occasion to control the landing of the aircraft because ground visibility at the airfield was below certain established minimums. During the time involved, there were three such landings and some of the testimony found in the record was furnished by a pilot whose life was endangered by the muddled directions given by the accused. When officials at the post became apprehensive, accused's company commander proceeded to the van where he found the accused in what he described as "blind drunk" condition. The accused was taken to a hospital, where he was examined by a Dr. Gipson. Appellate defense counsel argue the premise that, because Dr. Gipson directed that a blood test be given, the accused was compelled to incriminate himself. The board of review, without weighing the facts for compulsion, held that the evidence was admissible because an accused man can be compelled to submit himself to a blood test without violating Article 31 of the Code, 10 USC § 831, when the sample is obtained by scientific means and not by some brutal method. While the record is too underdeveloped to find compul-

sion, I shall assume the accused submitted to the extraction of blood because of an order.

A majority of this Court has held that an order directing an accused to furnish a urine sample was illegal, United States v Jordan, 7 USCMA 452, 22 CMR 242, but Judge Ferguson reserved the question of the admissibility of the results if a sample was obtained. In United States v Williamson, 4 USCMA 320, 15 CMR 320, Judge Brosman and the author held the results to be competent and relevant testimony and admissible, but the Chief Judge dissented. While it is apparent from the foregoing that the Court has been divided in urinalysis cases, a recent United States Supreme Court decision has furnished some guideposts in the field of taking blood for purposes of establishing the absence or presence of alcohol or habit-forming drugs in the human body. In Breithaupt v Abram, 352 US 432, 77 S Ct 408, 1 L ed 2d 448, the Supreme Court, in distinguishing Rochin v California, 342 US 165, 96 L ed 183, 72 S Ct 205, stated:

"Basically the distinction rests on the fact that there is nothing 'brutal' or 'offensive' in the taking of a sample of blood when done, as in this case, under the protective eye of a physician. To be sure, the driver here was unconscious when the blood was taken, but the absence of conscious consent, without more, does not necessarily render the taking a violation of a constitutional right; and certainly the test as administered here would not be considered offensive by even the most delicate. Furthermore, due process is not measured by the yardstick of personal reaction or the sphygmogram of the most sensitive person, but by that whole community sense of 'decency and fairness' that has been woven by common experience into the fabric of acceptable conduct. It is on this bedrock that this Court has established the concept of due process. The blood test procedure has become routine in our everyday life. It is a ritual for those going into the military service as well as those applying for mar-

riage licenses. Many colleges require such tests before permitting entrance and literally millions of us have voluntarily gone through the same, though a longer, routine in becoming blood donors. Likewise, we note that a majority of our States have either enacted statutes in some form authorizing tests of this nature or permit findings so obtained to be admitted in evidence. We therefore conclude that a blood test taken by a skilled technician is not such 'conduct that shocks the conscience,' *Rochin, supra,* at 172, nor such a method of obtaining evidence that it offends a 'sense of justice,' *Brown* v. *Mississippi,* 297 U. S. 278, 285–286 (1936). This is not to say that the indiscriminate taking of blood under different conditions or by those not competent to do so may not amount to such 'brutality' as would come under the *Rochin* rule. The chief law-enforcement officer of New Mexico, while at the Bar of this Court, assured us that every proper medical precaution is afforded an accused from whom the blood is taken."

The Supreme Court, having distinguished the stomach pump case (Rochin) from the blood sampling case (Breithaupt), makes it somewhat easier to evaluate this case for purposes of military law. Certainly, blood sampling is less embarrassing to the giver and less shocking to the conscience of the community than catheterization. The former is much further removed from the brutal and offensive stomach pump case than is the latter. Here, the Government obtained the evidence in a well-recognized and legal manner. The taking of the blood was performed under recognized medical and protective standards, and it is now a requirement in every complete physical examination. Rather than being shocking, it is commonplace. While it is contended that the results of tests based on any extraction of bodily fluids should be denied admission into evidence, I am content to rely on my previous concepts and the rule of the Supreme Court in blood sampling cases. Here, the method employed was not so offensive that it would shock

the conscience of an ordinary person, and certainly it is in keeping with acceptable standards of due process of law. Based on that and limiting the principle to blood sampling, I find no denial of due process of law and conclude the law officer did not err in admitting the test in evidence.

## IV

The last interesting and important question has to do with the admissibility of Captain DeRiemer's testimony of the odor of alcohol on accused's breath. Appellate defense counsel contend that this testimony was also inadmissible because it was obtained under the orders of a superior, thus compelling accused to incriminate himself. The board of review decided the question was not reserved for review since no objection was raised to such testimony by the defense at the trial level. Because of the importance of the issue involved, I prefer to brush that reasoning aside and reach straight to the heart of the question. Therefore, I will consider the contention that evidence of the alcoholic odor on the breath of the accused was inadmissible because it is barred by the provisions of Article 31.

In United States v Eggers, 3 USCMA 191, 11 CMR 191, and United States v Rosato, 3 USCMA 143, 11 CMR 143, we gave considerable thought to the difficult question of applying the doctrine of self-incrimination in certain areas. In the former case, we placed testimonial utterances on one side of the ledger and held they came within the privilege, and acts such as displaying the body, fitting on clothes, and fingerprinting, we said, should be carried on the other side and suggested that they fell without the protection. We concluded handwriting belonged with the first class and, therefore, exemplars could not be obtained by compulsion. In this particular instance, I believe exhalation must be grouped with the second class and is, therefore, admissible. It is beyond cavil that a person must breathe to live and in the process of exhaling, certain odors emanate from the mouth. If an investigator ap-

proaches closely enough to smell the odor of alcohol on an accused's breath, he should be able to testify to that fact without offending against Article 31. In that backdrop, there is neither compulsion nor self-incrimination. However, the defense maintains that the commanding officer, by thrice ordering the accused to blow his breath in his face, required the accused to furnish incriminating evidence against himself and the compulsion renders the evidence inadmissible. I am convinced the contention of the accused must be rejected. While it is true the officer directed the accused to increase his efforts to simplify the gathering of evidence, that was only to save the inconvenience of obtaining the evidence in other ways. The officer could, of course, have used the alternative method of having someone hold the accused while the officer approached closely enough to make the determination without requiring additional exertion. But, in preference to using physical methods to obtain the evidence, he directed the accused to exert some additional efforts to force his breath outwardly far enough to avoid personal contact. The order did not require the creation or production of evidence. The odor was there, and the effect of the order was to bring the accused nearer without inconvenience. In complying with the order of the Captain, the accused was doing no more than he could have been required to do had he been directed to open his mouth, raise his arm, lift his leg, or move at all. Accordingly, I believe the testimony was admissible in evidence.

I would affirm the decision of the board of review. My associates conclude otherwise, however, and, as a matter of caution, I do not commend my views to the law officer in the second hearing of this case. Since the majority opinion is eloquent in its silence, he must rely on his best judgment.