UNITED STATES, Appellee

v

MELVIN S. CARTER, CLIFTON FRANKS, RAYMOND L. KASEY, JAMES GORDON, and EDWARD L. BROWN, Privates, and JAMES E. WILSON, JR., and FRED R. CHANDLER, Privates First Class, U. S. Army, Appellants

9 USCMA 108, 25 CMR 370

No. 10,267

Decided April 4, 1958

*Captain Arnold I. Melnick* argued the cause for Appellants, Accused. With him on the brief were *James H. Reidy, Esquire, Perry G. Panos, Esquire, Colonel J. M. Pitzer, Colonel Edward M. O'Connell* and *First Lieutenant Stephen D. Potts.*

*First Lieutenant Chester F. Relyea* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel John G. Lee* and *Major Thomas J. Nichols.*

### Opinion of the Court

GEORGE W. LATIMER, Judge:

As to the facts of this case, it is only necessary to state that the accused were convicted of rape of a fifteen-year-

old German girl who was on her way home accompanied by a young male companion. He. was restrained by some of the participants while the offenses were being committed and, in the course of some fifteen minutes, the victim was raped at least five times. The offenses stirred up a storm of public protest in the city of Bamberg, Germany, where the incident occurred. Editorials and articles, appearing in the local press, voiced the indignation of the outraged host populace toward this country's occupying troops. The incident was depicted as one of many such bestialities by American soldiers which had made the city's public places unsafe for the citizenry. Comparisons were made to the bygone sentiments of odium and fear of the people for the claimed barbarianism of Russian troops during that nation's military occupation of Bamberg following the Second World War. According to newspaper reports, the incident touched off a series of extraordinary counter-measures by the city's officialdom, including the passage of a resolution by the City Council demanding the removal of American troops. Accounts were given of civil officials seeking and receiving the assurances of American military commanders that steps would be taken to improve community relationships and that discipline would be stiffened to the end that civilians would no longer be the victims of such acts of violence. The last of the German newspaper articles on the subject, of which the the law officer was apprised, appeared two weeks after the first publication. An American language newspaper, which was circulated locally, reported that scores of "poison pen letters" had been received by our military leaders in the wake of the incident.

The accused were brought to trial before a general court-martial approximately one month after the gang rape—which by this time had somewhat subsided as a cause celebre—was alleged to have occurred. The trial situs was the locality of Wurzburg, Germany, a little over sixty miles from Bamberg. Before pleading to the charge, defense counsel made a motion for a change of venue founded upon documentary evidence of: (1) the described newspaper articles, (2) the prejudgment of the case and command influence by the Commander-in-Chief, U. S. Army, Europe, and (3) bias on the part of American military personnel in Europe in general and the court members in particular. In support of the second and third grounds of his motion, defense counsel introduced three documents.

The first purported to be "COMMENTS BY THE COMMANDER IN CHIEF" delivered some two weeks after the raping of the prosecutrix in this case, before an Ambassador-Army Commanders conference. So that the comments will not be torn from context, we quote the most important part of the directive:

"Now as most of you know, during the past six weeks it has been necessary for me to issue several directives on the prevention and elimination of serious incidents between our soldiers and German civilians.

"I think it is a very sad commentary on us, as commanders, when the reputation of the United States Army—as a matter of fact, when the reputation of the United States—is permitted to be jeopardized by a few 'bums'. Now it shouldn't have been necessary, in my opinion, to issue more than one directive on this subject and I think that the directive that came out on 16 June if it had gotten down to the lowest echelon and was executed as was intended by this headquarters we would have saved ourselves at least the July incidents. Because, if you go back and reread the 16 June directive of this headquarters there is everything in it that is necessary, in general terms. It shouldn't be necessary for the larger headquarters, and I mean all those immediately subordinate to this one, to have to spell out things in great detail but apparently from the results we must do so and I am going to spell them out. Again, it matters little that the U.S. Army personnel in Germany participated in about 700 worthwhile community events during the past three months when one rape case, in which seven soldiers repeatedly attacked a 15-year old girl, draws

110

unfavorable world-wide publicity. That one incident knocked out those 700 good deeds. The cold-blooded murder of an aged ferryboat operator by a soldier bent on robbery overshadows by far all the positive and worthwhile projects our people have accomplished for their German neighbors. Then, of course, this was followed by a rape case by four enlisted men. The grenade case was ahead of this. I don't expect people to work miracles but I do expect, and I am going to demand, that these criminal acts against the citizens of our host nation be brought to an irreducible minimum immediately. I hope that the directives that have been issued from here will assist you in reducing these incidents and I expect them to be vigorously and continuously carried out."

The balance of the document refers to methods for elimination of undesirable personnel through administrative procedures. It is not asserted that the court members were in attendance at this conference. However, attached to this document was a forwarding letter from the Commanding General of the Seventh Army that all subordinate commanders acquaint all officers in their commands with the policies and desires expressed by the Commander-in-Chief of the Army in Europe. Also attached was the endorsement of this directive, to the commanding officers of his division, by the convening authority in this case.

The second document, also distributed throughout the convening authority's command, contained comments made by the Commanding General, Seventh Army, more than a month before, and disseminated by his headquarters about two weeks prior to, the events leading to the charges of this case. It contained suggestions, in six categories, for the improvement of German-American community relations, of which the following is one:

"c. Officers and NCOs must set the example by avoiding participation in incidents. Any violations must be severely dealt with. They must take action promptly to step in when the stage is being set for trouble."

The third piece of documentary evidence was a directive, which was claimed to have emanated, though it did not reflect this fact, from the headquarters of the convening authority's command. Issued about twenty days after the alleged offenses of this case, it created limitations on passes and leaves.

An extensive voir dire examination was conducted by defense counsel at the time he sought to challenge the members, to which we will later refer. After giving consideration to the evidence produced by this examination and to all of the documents in evidence, the law officer asked the court members various questions under oath. Upon this voir dire, the members' responses indicated that they had formed no opinions, either because of the publicity or the military documents and directives in evidence—whether they received them or had knowledge of them—which would render them incapable of returning fair and impartial findings, or, in the event determinations of guilt were arrived at, to render fair and impartial sentences. The law officer thereupon denied the motion to change the place of trial, the accused pleaded not guilty and the trial ensued, resulting in their conviction of rape, either as principals or as aiders and abettors, in violation of Article 120, Uniform Code of Military Justice, 10 USC § 920. Four of the accused were sentenced to dishonorable discharge, total forfeitures, and confinement at hard labor for life and the three others to dishonorable discharge, total forfeitures and confinement at hard labor for forty years. The convening authority approved the findings and sentences but the board of review, in affirming, reduced the life sentences to dishonorable discharge, total forfeitures, and confinement at hard labor for thirty years and the lesser sentences to dishonorable discharge, total forfeitures, and confinement at hard labor for fifteen years. Petitions for review were filed in this Court and review was granted upon these two issues:

"1. Whether the law officer erred in denying the motion for change of venue.

"2. Whether the pretrial 'remarks of the Commander in Chief, U. S.

Army, Europe' deprived the accused of a fair trial."

There is no specific provision for a motion for change of venue in military law. However, in United ▮▮▮▮▮▮▮ States v Gravitt, 5 USCMA 249, 17 CMR 249, it was settled that "if . . . [the accused] can demonstrate that the court would be adversely influenced by a general atmosphere of hostility or partiality against him, existing at the place of trial, he would be entitled to be tried in some other place." A like motion may be made in the Federal district courts under Rule 21a of the Federal Rules of Criminal Procedure, which states:

"The court upon motion of the defendant shall transfer the proceeding as to him to another district or division if the court is satisfied that there exists in the district or division where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that district or division."

In the spirit of Article 36(a), Uniform Code of Military Justice, 10 USC § 836, we too consider the ▮▮▮▮▮▮▮ motion as one addressed to the sound discretion of the trial court. See 4 Barron and Holtzoff, Federal Practice and Procedure (Rules Edition, 1950), § 2092. In overruling the motion in this case, the law officer was therefore not in error unless it is manifest to us that he abused his discretion.

We do not get the impression, upon examination of the newspaper articles in evidence, that a campaign was being carried on to influence the findings and sentence of the court-martial in this particular case. The commentaries were impassioned, but that was quite natural for, as mirroring public opinion, they reflected the shock, righteous anger, and fear engendered in the general public at the mass rape of a young girl in their community. As was said in Robinson v United States, 128 F2d 322 (CA DC Cir) (1942): "A general indignation toward those who commit rape is not regarded by our society as bias or prejudice." True, the early articles clamored for the apprehension of the guilty parties and subsequent ones applauded the dispatch with which the law enforcement segment of the military establishment in the area apprehended the suspects. After that time, the main theme of newspaper comment was to throw the blame upon the American military commanders rather than the accused and call for increased discipline in the military community. With regard to the poison pen letters, the American language newspaper which reported their receipt by high American officers also added that "no one was taking them very seriously." All other public communications complained of were printed or written in the German tongue. The question then is what effect did the German language newspaper publicity have upon the court members? Defense counsel had the opportunity to gauge this outside pressure upon voir dire. Of ten officers asked, seven did not read German, one read "very little," and the other two read German adequately. Two of those members of the court who were literate in German did not read German publications, and the third had no present recollection of what he had read in German papers. Only two members of the court-martial were asked about their knowledge of the German reaction to the case or to what extent this reaction might influence their deliberations. One testified that he and his wife had many German friends in Wurzberg but that he had not discussed the case with them, that he did not know how they felt about it, that these friendships would not affect his deliberations in any way, and that if the trial should end in acquittals, he did not think he would lose his German friends who knew he had been a member of the court. The other member questioned testified that he had had an official interest in the case from the standpoint of German-American relations but not from the point of view of the truth or falsity of the criminal charges. He continued by saying he was aware of the feeling generated among the German people, but that in

his opinion this feeling was not as intense as the articles indicated, that not all publicity concerning the aspects of this offense were unfavorable, that he had no opinion on the merits nor bias against the accused, and that he could well and truly decide the issues on the facts. Considering the testimony on voir dire examination, the limited capacity of the officer personnel to read the articles, the total lack of evidence that any article had been read by a single court member, their disavowal of any influence by the German press, and the locus of the trial, we are convinced there was more than substantial evidence to support the decision of the law officer that the newspaper articles in evidence did not demand a transfer of the place of trial. See Mayo v Blackburn, 250 F2d 645 (CA5th Cir) (1958).

Considering next the comments of the Commander-in-Chief of the United States Army in Europe, ▉▉▉▉ that communication was given to the court members by defense counsel during the challenge proceeding and, even if it were not, we would presume that it had been read or discussed by every member of the court-martial in accordance with the attached distribution directive. It is claimed that this document demonstrates a prejudgment of the case and the exercise of command influence by the Commander-in-Chief over the court-martial. This Court does not agree. It is to be remembered that this presentation was given at an Ambassador-Army Commanders Conference at which a limited number of senior officers were present. The subject under discussion was German-American relationship, and it is obvious that the Commander had no personal knowledge of the facts supporting the alleged offense. He was not concerned with discussing the merits of the case and he could have had no idea who would be selected for the court. That selection was to be made at two levels below his command. His purpose was to improve military discipline and thereby cut down the crime rate, and he was referring to cases which had made headlines and had undoubtedly reached his headquarters in the form of official German complaints. He was seeking to impress the senior commanders with the necessity of taking appropriate steps to tighten lax supervision over Army personnel as a preventive measure against future offenses. The remarks were in implementation of previous directives he had issued on the same subject matter; they were not beamed at personnel assigned to courts-martial; and they did not disclose a fixed determination on the guilt or innocence of these accused. Considered in the backdrop of the situation confronting the Commander-in-Chief, his comments dealt with measures which might give hope that tomorrow relations with the host country would be improved and good feelings toward the United States would be restored. That officer would have failed to carry out the responsibilities of his high office if he had ignored the strain so apparently put upon relations between the two countries by the crimes of this period and failed to take action to prevent repetition of incidents in the future. To illustrate the theme of his discourse, he identified, in all, four notorious and recent crimes of violence against the citizens of the host nation involving United States soldiers. He asserted that discipline was not supervised properly, and he demanded that criminal activities be brought to "an irreducible minimum immediately." He suggested that subordinate commanders weed out undesirable personnel by means of administrative discharges. He mentioned ways and means of preventing soldiers from obtaining ammunition for use in crimes of violence. He observed that training should be intensified and that more wholesome recreational activities should be encouraged. From its tenor, it is apparent the document was a prophylactic memorandum and not a court interference scheme. Nowhere therein does he express a prejudgment of this case, nor does he seek to influence the outcome on the findings or sentence. His comment to the effect that, although he had already issued directives on the subject, they had apparently not reached every echelon of his command because such incidents were still occurring and drawing unfavorable world-wide publicity, shows an effort to reduce the crime

rate, not by a one-case interference but by a series of constructive and corrective military methods. His reference to "one rape case, in which seven soldiers repeatedly attacked a 15-year old girl," is construable in its context as mere elaboration on the theme that the public tends to measure an Army by its vices rather than its virtues. He was seeking the desirable goal of decreasing the former and improving the latter. and, while a commander's motives may be unimportant if the methods he employs deny a court member freedom of thought, there is here a legitimate purpose which does not impinge on that liberty. Therefore, we do not believe this officer strayed beyond the limits of his responsibilities to the countries concerned.

Appellate counsel for the defense make much of the proposition that this case must be reversed because the comments had general circulation and would reach all officers of the command. When that argument is carried to its natural conclusion, a cul-de-sac is reached, for these accused could not have been tried anywhere in Europe, since under the defense theory every officer in that theater was disqualified. It is true that the comments may have reached all officers of the European command for the obvious reason that each commander, from a general to the lieutenant, had a part to play in stopping the deterioration of the civilian-military relations. But coverage is not the test. In command influence cases, this Court has stressed that its evil lies in military superiors or their representatives aiming influence at officers selected for courts; United States v McCann, 8 USCMA 675, 25 CMR 179; United States v Hawthorne, 7 USCMA 293, 22 CMR 83; United States v Zagar, 5 USCMA 410, 18 CMR 34; United States v Ferguson, 5 USCMA 68, 17 CMR 68; United States v Hunter, 3 USCMA 497, 13 CMR 53; or in the prosecution injecting command policy into trials; United States v Holmes, 7 USCMA 642, 23 CMR 106; United States v Estrada, 7 USCMA 635, 23 CMR 99; United States v Fowle, 7 USCMA 349, 22 CMR 139; or in those situations in which it was apparent the court had been influ-

enced by policy directives; United States v Schultz, 8 USCMA 129, 23 CMR 353; United States v Walinch, 8 USCMA 3, 23 CMR 227. This case is readily distinguishable from those set out above. In those instances, there was a close causal connection between the directive of the commander and the particular case being tried. Here, there was no such connection. The clear thrust of the remarks of the Commander-in-Chief was the improvement of discipline by other than judicial processes; for example, the more extended use of administrative discharges for incorrigibles. They were detached from any and every court then existing; they were not directed toward any particular case; and they did not call for court-martial convictions, with their concomitant punitive discharges.

The prosecution cannot be accused of injecting command control into the trial, for the particular document was requested by members of the court during the challenge proceeding. In order to understand defense counsel's challenge of one member, who was one of the distributees of the document in question, the other members needed to be more adequately informed on the subject. Defense counsel willingly furnished his copy. However, in admitting the exhibit, the law officer cautioned the court that the document would only be considered for the purpose of a challenge and that any information in it was to be disregarded in the trial. Moreover, with regard to the court members themselves, each of them solemnly and unequivocally stated, upon voir dire, that he would not be influenced by the contents of the document, regardless of whether or not they had previously heard of its contents. We, therefore, conclude that the efforts of the Commander-in-Chief to buoy up sagging German-American relations did not constitute command control.

This leaves for discussion the document promulgated by the Commanding General of the Seventh Army. This was issued sometime before the commission of the offenses of this case, and it appealed to officers and noncommissioned officers to set examples by avoid-

ing incidents with German nationals. It then went on to say that violations should be dealt with severely. It was not brought to the court's attention at trial, and it was an administrative regulation which prescribed measures to be taken to discourage future incidents of a criminal nature. It was published to govern conduct of all military personnel, and it set out a variety of ways in which to better local conditions and improve military discipline. Its language was couched well within permissible limits, and we find nothing improper about its promulgation.

We have considered the argument that the limitations upon passes and leaves was imposed to ▇▇▇▇▇ coerce the court, and we find it meritless. In the challenge proceeding, four members of the court were interrogated upon the limitations, and the reasons they gave for the imposition of more stringent rules for issuance were speculative. Those who thought the order might be interpreted as an aftermath of this offense concluded the restrictions were imposed as an ordinary military expedient to avoid incidents in the future. While the subject was mentioned in the Commander-in-Chief's conference directive, it was but one of several suggested methods of controlling incorrigibles and poor community risks. In the directive, the Commander-in-Chief went no further than to suggest a more careful granting of liberty from duties. We find nothing improper or court-influencing in either his observations or in the lower commanders more carefully screening the personnel to whom liberty was to be granted.

For the foregoing reasons, the decision of the board of review is affirmed.

Chief Judge QUINN and Judge FERGUSON concur.