UNITED STATES, Appellee

v

HARRY F. OLSON, JR., Basic Airman,
U. S. Air Force, Appellant

11 USCMA 286, 29 CMR 102

No. 13,451

Decided March 4, 1960

*Lieutenant Colonel Philip J. Williamson* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel James L. Kilgore.*

*Captain Richard T. Yery* argued the cause for Appellee, United States. With him on the brief was *Colonel John F. Hanningan.*

### Opinion of the Court

HOMER FERGUSON, Judge:

Tried by general court-martial, the accused was found guilty of desertion, larceny, and six specifications of uttering forged checks, in violation, respectively, of Uniform Code of Military Justice, Articles 85, 121, and 123, 10 USC §§ 885, 921, 923. He was sentenced to dishonorable discharge, forfeiture of all pay and allowances, and confinement at hard labor for three years. The convening authority made changes in the findings of guilty regarding desertion and reduced that portion

of accused's sentence relating to confinement to two years. He otherwise approved the findings and sentence and forwarded the record of trial to The Judge Advocate General, United States Air Force, for review by a board of review. That body affirmed the findings and sentence, and we granted accused's petition for review on a number of issues, only one of which—the existence of command control at the trial level—is pertinent to our disposition of the case.

At the commencement of his trial, the accused leveled challenges for cause against the president and five members of the court-martial. By *voir dire* examination, he established that the president, Colonel Farnell, was Deputy Chief of Staff for Personnel, 313th Air Division, the convening authority's command. His office was responsible for the staffing of a directive, signed by the Acting Commander, 313th Air Division, the subject of which was "Dishonored Checks." The directive provided:

"1. Despite the emphasis placed on the subject of dishonored checks by all echelons in this theater, there has been no appreciable decline in the number of dishonored checks issued by members of this command. Although there has been a decline in the number of repeat offenders, the overall volume of dishonored checks remains high.

"2. The vast majority of dishonored checks written by members of this command are issued without any specific intent to deceive anyone. On the contrary, their delinquencies appear to result primarily from carelessness and a lack of understanding of sound checking procedures. It is to this group that the contents of this letter apply.

"3. It is apparent that many individuals are in the habit of writing several checks and only periodically computing their checking account balances. Sound practice dictates that one should re-compute his balance immediately after writing each check. By so doing, the chances of overdrawing an account are minimized. Other individuals have assumed that their accounts have been credited with certain amounts of money when actually the account has not been so credited. One should never assume his account has been credited. The only dependable practice is to add to a check book balance only that sum which the bank acknowledges it has credited to your account.

"4. Many of our officers and airmen do not maintain checking accounts of sufficient size to cover mistakes resulting from carelessness or the use of improper checking procedures. For example, some accounts have been overdrawn when checks in amounts of less than three dollars were written. Such individuals must be particularly meticulous in managing their accounts.

"5. Prompt and appropriate disciplinary action will continue to be taken with respect to each offender. While the serious consequences which may befall those who write bad checks have been well publicized, sufficient action has not been taken to indoctrinate our personnel with a better understanding of sound checking procedures. Therefore, it is my desire that you take immediate steps to educate the personnel of your command with respect to this aspect of the dishonored check problem."

In addition, Colonel Farnell was responsible for monitoring the Division's bad check program and maintaining in his office a list of those individuals who had become involved in such misconduct.

On February 9, 1959, the day prior to the convening of accused's court-martial, Colonel Farnell presided at an "Officers' Call." Those in attendance included five members of the court-martial. While there are indications in the record that other topics were also discussed, it is certain that Colonel Farnell presented a pointed lecture on the high incidence of bad check offenses within the Division. He emphasized that the organization compared unfavorably wth other similar units with respect to the number of check offenses and set forth the necessity for taking

positive action to eliminate such misconduct. Information furnished those in attendance referred generally to the policy and published statements of the convening authority but made no reference to particular incidents.

The president and those court members who were present at the former's lecture all insisted that the policies of the convening authority and other matters made known to them would not affect their deliberations on the guilt or innocence of the accused or, in the event of findings of guilty, the adjudging of a just sentence. Moreover, it was indicated that they were individually of the opinion that the policy directive set forth above did not demand the application of set standards in every bad check case. Rather, the convening authority merely directed that they investigate each such incident in their function as commanders and dispose of it in accordance with all of the disclosed circumstances.

Based upon the foregoing matters, defense counsel individually challenged the president of the court-martial and each member who had attended the lecture. When these challenges were not sustained by the court, he sought the declaration of a mistrial upon the basis of command control. His motion for that relief was denied by the law officer. He then exercised his peremptory challenge against one member who attended the lecture.

The Government argues that the bad check program disclosed upon *voir dire* examination and the directive published by the Acting Commander, 313th Air Division, amounted to no more than a preventive discipline program designed to eliminate misconduct rather than to affect the deliberations of a court-martial. On the other hand, the accused contends that the command letter and the matters discussed at the pretrial conference had such a pervasive effect upon the members that, regardless of their disclaimers, they could not fairly participate in his trial. We agree with the latter position.

Having in mind the torrent of complaints concerning command control of military justice with which it was inundated following World War II, Congress sought through enactment of the Uniform Code of Military Justice to assure that accused's guilt and punishment, if any, was determined in truly judicial proceedings and that no improper influence would be brought to bear upon courts-martial. United States v Littrice, 3 USCMA 487, 13 CMR 43. In United States v Navarre, 5 USCMA 32, 17 CMR 32, we adverted to the legislative purpose behind the enactment of Code, supra, Article 37, 10 USC § 837, when we stated, at page 37:

". . . Needless to say, this provision of the Code purports to assure to all in the military service an absolutely fair trial in which the findings and sentence are determined solely upon the evidence, *and free from all unlawful influence exerted by any military superior.*" [Emphasis supplied.]

In order to enforce the Congressional mandate and to assure accused persons a fair hearing, we have been required to reverse a number of convictions. These have involved the discussion of command desires by convening authorities or their representatives with those persons selected to serve on courts-martial. United States v Littrice, supra; United States v McCann, 8 USCMA 675, 25 CMR 179; United States v Hawthorne, 7 USCMA 293, 22 CMR 83. Reversive action has also been predicated upon the injection of command policies into the actual trial of cases. United States v Holmes, 7 USCMA 642, 23 CMR 106; United States v Estrada, 7 USCMA 635, 23 CMR 99; United States v Fowle, 7 USCMA 349, 22 CMR 139. It has also occurred in those cases in which there was a fair risk that court members were influenced by policy statements. United States v Schultz, 8 USCMA 129, 23 CMR 353; United States v Walinch, 8 USCMA 3, 23 CMR 227.

On the other hand, we have recognized the necessity for the maintenance of order in the armed forces and the commander's responsibility for the institution of appropriate preventive measures. United States v Isbell, 3 USCMA 782, 14 CMR 200;

United States v Carter, 9 USCMA 108, 25 CMR 370. Thus, we have sought to maintain a "delicate balance between justice and discipline." United States v Littrice, supra, at page 491. What a few commanders fail to realize, however, is that the scales always become loaded against justice when lectures attended by court members involve extended discussion of offenses identical or closely related to those for which an accused is shortly to be tried. See United States v McCann, supra. In such instances, the respect for command authority ingrained in the average officer predisposes him to judge the accused in the light of the needs of the service rather than impartially to consider the charges and the evidence. The result is drumhead justice—a situation which may as adversely affect discipline and morale as the offenses which originally led to the pretrial lectures.

Turning to the record before us, it is clear that the president of the court-martial was responsible ■■■■■■■■ ■ for the formulation of policy directives affecting the disposition of those who were involved in bad check offenses—delicts closely related to the charges against accused. He was also charged with the duty of monitoring the Division's bad check program and, in fact, delivered the lecture attended by the other members. Emphasis was there placed upon the command's poor standing with respect to bad checks and the need for corrective measures was clearly demonstrated. The combined impact of the directive and the pretrial lecture upon the members is hardly to be doubted. The disqualification of the president to serve is even more strongly established. The accused was entitled to be tried before a court-martial whose members were free from any influences beyond the courtroom. In view of the bad check situation made known to the personnel here involved, the temptation to make an example of Olson must have been strong. Under the Code, however, he was entitled to a hearing at which he did not run the risk of being utilized as a warning for those who would follow in his foot-

steps. In short, the probability of improper influence upon the president and members of the court-martial is established beyond cavil by this record. Thus, the challenges should have been sustained. United States v McCann, supra; United States v Littrice, supra. As they were overruled, prejudice is apparent and reversal must follow.

Left for consideration is the extent of the corrective action required. Appellate defense counsel ■■■■■■■■ ■ prays only for disapproval of the findings of guilty of larceny and forgery and a rehearing on the sentence. We believe that he misapprehends the pervasive effect of command control in this record. The evidence regarding accused's alleged desertion is not clear and convincing. A court-martial freed from improper influence may well have reached a different verdict. Under the circumstances, we conclude that the interests of justice will be better served by a rehearing on all charges and specifications.

The decision of the board of review is reversed and the record of trial is returned to The Judge Advocate General of the Air Force for direction of a rehearing or dismissal of the charges.

Chief Judge QUINN concurs.

LATIMER, Judge (dissenting):

I dissent.

There may be some reason to support a belief that, absent a shortage of officers, the deputy chief of staff for personnel should not be detailed as president of a court-martial, but there is no justification for using that belief to reverse eight findings of guilt against this accused. There was ample evidence to prove the specifications alleging desertion, larceny, and forgery, there was no defense evidence to rebut the testimony of the prosecution witnesses, the accused had barely finished serving a sentence for having committed seven worthless check offenses, and any reasonable trier of fact would have found him guilty on this record. In making this reference to the quantity and quality of the evi-

dence, I am not suggesting that a guilty person is not entitled to be tried by a fair and impartial court-martial, but here the facts and circumstances, when properly evaluated, show that the accused was accorded that right. When all the events are considered in their totality, they merely show a wholesome effort to reduce the traffic in worthless checks and a command climate which sought to improve leadership and not improperly to influence court members.

This case was tried at Naha Air Base, Okinawa, commencing on February 10, 1959. Some four months prior thereto, the then commanding officer promulgated a letter on the subject of dishonored checks. Judge Ferguson has quoted the epistle in full, and it is not necessary that its contents be repeated. Suffice it for me to say the letter is a perfectly proper way to circularize members of a command on an unhealthy condition which is all too prevalent in the services and which is becoming most difficult to control. The first four paragraphs are explanatory and advisory and contain may words of wisdom. If there is any statement in the letter which, by any stretch of the imagination, contains any coercive language, it is found in paragraph 5, which states: "Prompt and appropriate disciplinary action will continue to be taken with respect to each offender." However, when considered fairly, this sentence merely tells subordinates that previous efforts to stamp out the vice by appropriate disciplinary action should not be lessened. That counsel is not threatening and, when considered by its four corners, the tenor of the letter is not for lower commanders to pursue a tougher course against offenders, but rather to indoctrinate personnel of their units with a better understanding of sound checking procedure and educate them with respect to handling their bank accounts. I dare say the advice contained in that letter was most wholesome and, had it been complied with, the troubles of that command would have been lessened and the morale improved. But aside from its merits,

when considered for its importance on the findings and sentence in this case, the following factors must be taken into account. The objective of the letter was to prevent crime, it was published long prior to this accused's offenses, it was not beamed at court-martial members, and it was not pointed toward any particular offender or case.

We have considered letters of similar purport, and we have not hesitated to say they were an appropriate vehicle for use by a commanding officer in demanding leadership by junior members of his command. In United States v Carter, 9 USCMA 108, 25 CMR 370, we affirmed convictions where a letter circulated by the commander specifically mentioned the crimes committed by the accused, and in it all subordinate commanders were exhorted to carry out vigorously and continuously prior policy directives which had as their purpose the elimination of serious crimes involving the German people. We there expressed the following view:

". . . His purpose was to improve military discipline and thereby cut down the crime rate, and he was referring to cases which had made headlines and had undoubtedly reached his headquarters in the form of official German complaints. He was seeking to impress the senior commanders with the necessity of taking appropriate steps to tighten lax supervision over Army personnel as a preventive measure against future offenses. The remarks were in implementation of previous directives he had issued on the same subject matter; they were not beamed at personnel assigned to courts-martial; and they did not disclose a fixed determination on the guilt or innocence of these accused."

In United States v Isbell, 3 USCMA 782, 14 CMR 200, the Chief Judge, speaking for a majority of the Court, stated:

"The circumstances of the instant case are entirely different. Here the

letter was disseminated to the command as a part of a general program of indoctrination and instruction. When this document was distributed, the offenses of which the accused was convicted had not been committed, nor had the court-martial before which he was tried been appointed. Therefore, references to efficiency reports can hardly be said to contain any threat to the members of a court, without distorting the plain language of the letter beyond its usual and intended meaning. As used in this case, the letter of the Commanding General, United States Army, Europe, was an appropriate directive to a subordinate commander. Such use was a legal one. There is neither error nor prejudice to the rights of the accused."

In the case at bar, the letter was written before five of the six worthless checks had been uttered by the accused and before the other had been dishonored. When it was distributed, the court-martial members had not been appointed, and it antedated the trial of this accused by some four months. Certainly it is well within the guide lines laid out in the above-cited cases. Moreover, it does not offend against any of the other cases which, at first blush, may appear to be on the other side of the ledger. Obviously, we have reversed cases in which there has been an attempt by military superiors to influence the views and actions of members selected for courts-martial. United States v McCann, 8 USCMA 675, 25 CMR 179; United States v Hawthorne, 7 USCMA 293, 22 CMR 83; United States v Zagar, 5 USCMA 410, 18 CMR 34; United States v Ferguson, 5 USCMA 68, 17 CMR 68; and United States v Hunter, 3 USCMA 497, 13 CMR 53. Moreover, when command policy has been injected into the actual trials, we have granted rehearings. United States v Holmes, 7 USCMA 642, 23 CMR 106; United States v Estrada, 7 USCMA 635, 23 CMR 99; and United States v Fowle, 7 USCMA 349, 22 CMR 139. Finally, in those situations in which it was apparent the court had been influenced by policy directives, we would not affirm the findings and sentence. United States v Schultz, 8 USCMA 129, 23 CMR 353, and United States v Walinch, 8 USCMA 3, 23 CMR 227. As will later appear, this case is readily distinguishable from all those referred to in this paragraph.

As a general proposition, a study of the above-cited cases will establish that there has been a combination of facts and circumstances, including the timing of the events from which we could find there was a fair probability that the court-martial members had been influenced improperly. I, therefore, pass on to consider the incidents which occurred after the publication of the letter and before the conviction of this accused. On January 16, 1959, a general court-martial was appointed, and Colonel Farnell was the senior member and president. I have doubts that if I were a convening authority I would appoint my deputy chief of staff for personnel as president of a court-martial, for he reports to me on all matters pertaining to personnel, including discipline, and I would prefer to leave him detached from individual cases. But that is not to say he is disqualified to sit or, if selected, that he is my alter ego for controlling the court. He has the same freedom of thought and action as any other officer of the command. I know not the reason why the personnel officer was selected in this instance, for the record does not furnish me any help on the local command conditions. However, it does show the normal employment of a personnel staff officer in monitoring the check program and presenting to the assembled commanders the state of discipline of the troops. In view of the subject matter of the report and the nature of the meeting, I see nothing to disqualify the officer from membership on a court-martial.

In retrospect, I could say the timing of the lecture was not good, but that probably was a happenstance. Without some evidence to the contrary and with some to support my views, I assume that the comments were made at a regularly scheduled commander's conference at which many subjects were discussed. No doubt the prin-

cipal staff officers oriented the commanders on the state of supply, training, intelligence, and discipline. It was at this conference that Colonel Farnell spoke, and his subjects touched, *inter alia,* on dishonored checks. While his address was not reported and the details are not disclosed, the following statement was made by defense counsel. I am willing to accept the statement as evidence for the purpose of resolving this issue, and I believe it presents the incident in a way most favorable to the accused:

"DC: As Colonel Farnell testified, he gave a presentation at that Commanders' call during which the members of this court-martial were present; and, in this presentation he showed statistics, placing the 313th Air Division at the top of the list insofar as bad checks were concerned, within the Fifth Air Force. He admonished the people that this cannot be condoned; and further, he recalled to their attention the numerous policy letters that the Commander had put out."

The real vice of the opinion of my brothers is that they employ a disqualifying factor against officers who have been informed about the high percentage of crimes in their unit and directed to improve the conditions. Every officer should receive that information and I feel a commander is placed in a disciplinary strait jacket unless he can keep his troops abreast of the true situation. However, under this decision if he exhorts his subordinates to take effective efforts to correct the unhealthy condition, he may lose them as court members. That principle I unqualifiedly resist, for if the time has come when a commander cannot, without being charged with court-martial interference, inform his subordinates that their unit has the worst record of criminality in a division, that the condition must be improved, that he will not condone laxity in the enforcement of the law, that appropriate disciplinary action will be taken when deemed necessary, that policy letters suggesting means of bettering the conditions will be consid-

ered, and that leadership in getting the units out of a morass is demanded, then we have reached a sad state of affairs.

I dare say that lectures of the type indicated by this record have been given daily over the entire life of our military services. Significantly, in the services a high court-martial rate and a high incidence of crime, are considered as indicia of poor leadership, and every good commander admonishes his subordinates to cut both rates. Those are subjects discussed in most commanders' conferences, and I have the temerity to suggest that no officer who was then detailed as a court member would believe he was being brainwashed to act as a robot and return findings of guilt on any case on which he sat merely because a staff officer stated his commander desired that the crime rate be reduced. The thrust of comments to raise the standards of lawfulness within a command is toward improvement of leadership and not in the direction of increased courts-martial. As indicated, the standard of leadership and level of wrongdoing often tend to be inversely proportional. And although courts-martial are sometimes indispensable to discipline, Congress understood that leadership occupied a separate field, for while it intended to prevent commanders from influencing members of a court in their findings and sentence, it did not take away from them their prerogative and their obligation to improve the standards of conduct and morality of the personnel under their command. Failure to notice, publicize and curb the unlawful propensities of subordinates stamps a commander as lacking in leadership, and failure to take prophylactic measures to prevent the incidence of crime from rising demonstrates a lack of capacity to command. If experience is a teacher, our court record on check offenses ought to disclose that enough efforts are not being taken to halt the flow of worthless paper and that we should not penalize officers who seek to decrease crimes of this sort to an irreducible minimum. As a matter of interest, we are sometimes confronted with de-

fense contentions that, because of the lack of a firm policy, an accused was misled into believing it was all right to utter worthless checks. Apparently this commander was not of that ilk, and I for one am not critical of his efforts to better his command by having his appropriate staff officer alert the officers to the true situation.

Admittedly, cases of this sort occupy a sensitive area. But that makes it more important that we look to the individual case for any overlapping. If, as we have said, discipline and justice must be kept in delicate balance, then we should measure any asserted imbalance with care, and as my yardstick I use the testimony of the court members on *voir dire*. There were four commanders who were sitting as members of the court, and three of them were questioned on the effect of the division policy. The impact of any policy pronouncement and the orientation lecture on the members and their mental attitudes toward the offense and this accused was reflected by the following questions and answers. One of the officers gave these responses to defense counsel's *voir dire* examination:

"Q: Colonel Bradley, what is your capacity with the 33rd Air Rescue Squadron?

"A: I am the Squadron Commander.

"Q: In your capacity as Squadron Commander, have you set out certain policies with regard to the control of dishonored checks?

"A: The only control that I have in the Squadron is that there is a requirement that all personnel refrain from writing checks if they know at the time of the writing that they do not have sufficient funds to cover them.

"Q: Are you familiar, sir, with the policies expressed by General Dale O. Smith and Colonel Wallace C. Barrett in letters emanating from the 313th Air Division (PACAF) regarding dishonored checks?

"A: I am aware of the discussions previously held at officers' call as well as a particular letter from the 313th Air Division (PACAF) regarding bad checks; yes.

"Q: Do you recall anything that had been stated in regard to the action to be taken in the event a number of dishonored checks appeared against a certain individual in a squadron?

"A: The only thing that I recall is wherein a Commander is aware of a dishonored check or returned for insufficient funds, that a positive investigation will be made; and positive action will be taken.

"Q: By 'positive action', sir, what did you understand that to mean?

"A: I understood that to mean that appropriate measures are taken whenever an offense is committed; but there are extenuating circumstances; and each case must be decided individually; there are no set standards."

Another commander answered defense counsel as follows:

"Q: Major Morrison: What is your status with the 623rd Aircraft Control and Warning Squadron?

"A: Commander.

"Q: In your capacity as Commander, do you have occasion to enforce division policies with regard to dishonored checks?

"A: That is true.

"Q: Have you had any problems with dishonored checks?

"A: I don't have any problems; I am not concerned.

"Q: Do you have an influx of dishonored checks in your squadron?

"A: No.

"Q: What do you understand the division policy to be with regard to dishonored checks?

"A: That they should be reduced; in number, that is; or, all together; if possible.

"Q: Are you familiar with any recommended action that should be taken against an individual who cashes a number of dishonored checks?

"A: As a general overall thing?

"Q: Yes, sir.

"A: One: One is the denial of a checking account; and two: appropriate disciplinary action; if it is

deemed necessary, of course. Appropriate disciplinary action will be taken wherever necessary."

And a third court member replied:

"Q: Colonel Hubbard: What is your status with the 6431st Operations Squadron?

"A: I am the Commander.

"Q: Are you familiar with the policy by division regarding dishonored checks?

"A: Yes, I am.

"Q: Have you been bothered with the problem of dishonored checks?

"A: No."

In response to an inquiry as to their beliefs on the latitude permitted by the phrase quoted in the letter, the following shows the understanding of the two commanders questioned by defense counsel:

"Q: Colonel Bradley: I will read to you the first sentence in paragraph 5 of Defense Exhibit A, which is as follows: 'Prompt and appropriate disciplinary action will continue to be taken with respect to each offender.' Does that give you any leeway, do you feel?

"A: Surely; I am the Commander; I am the Commander who decides the action to take.

"Q: Major Morrison: Does this give you any option: 'Prompt and appropriate disciplinary action will continue to be taken with respect to each offender.'

"A: Definitely!

"Q: It does?

"A: Yes, it does."

Lastly, Colonel Farnell, who is made the villain of this drama, was interrogated, and I quote the two relevant questions and answers:

"Q: Colonel Farnell: If the case were to develop where an individual was accused of negotiating six checks that were dishonored or maybe five; but let's assume anyway that the same individual had previously been court-martialed for several checks that had been dishonored; would you feel that you could sit, as a member of the court, without being or having in the back of your mind, the influence of the stringent Fifth Air Force and the 313th Air Division policies with regard to dishonored checks?

"A: I think so, Lieutenant Licker.

"Q: Fine, sir; and Colonel Farnell, could you conceive yourself retaining an individual in the service of the United States Air Force who in the past year would have passed thirteen dishonored checks within this command?

"A: By all means! That, of itself, does not necessarily mean that a man should be automatically eliminated from the service."

Every member of the court expressed the belief that he could well and truly try the issues between the accused and the Government uninfluenced by any out-of-court events. I realize that there are outstanding judges who believe the doctrine that triers of fact are human and not always conscious to what extent they are in fact biased or prejudiced and that their inward sentiments cannot always be ascertained. I take a modified view of that concept for, unless there are circumstances which might tend to incite, inflame, or provoke resentment . against an accused or his offense, or which suggest a motive on the part of the individual to testify falsely, I believe a self-appraisal is accurate. Here we have no reason to be suspicious, and I repeat what I said in United States v Zagar, 5 USCMA 410, 18 CMR 34:

" . . . As I view this record there is only one legal question involved and that is, was the accused denied a trial by a fair and impartial court-martial? I conclude he was not, and in arriving at my conclusion I am willing to rely on the sworn testimony of each officer on *voir dire* that the orientation lecture would not influence him, in any manner, in reaching a fair and just finding and sentence based solely on the evidence adduced and the instructions given by the law officer at the trial. Where, as in those cases cited by my associates, an attempt has been made to bribe a juror and the matter is paraded before the entire panel, whether the impact on any given juror can be self-assessed need not now be determined.

But, unless a statement of a juror under oath that he has no fixed opinion on the guilt or innocence of an accused, and that he will decide the case on the evidence and the instructions of the judge, is accepted as worthy of belief, then all trial courts might just as well cast out *voir dire* of jurors. Those were my views in United States v Isbell, 3 USCMA 782, 14 CMR 200, and they remain unchanged. It may be, as my associates seem to hold, that appellate judges can better determine the mental state of a court-martial member, than can the member, but I would conclude otherwise."

Another factor is also of some importance. As previously stated, the eight specifications allege desertion, larceny, and six forgeries. None of the information relied on by my associates brings those offenses within the ambit of the letter, the monitoring program, or the staff conference and their alleged improper influence. There is absolutely no similarity between the first two enumerated offenses and negotiating checks without sufficient funds to pay them upon presentment. Even defense counsel, when he moved for appropriate relief and when he sought to challenge Colonel Farnell, conceded the court members were not disqualified to determine the guilt or innocence of the accused on those offenses. As to the other six specifications, the gravamen of those offenses was forgery, and one trying offenses of that severity would not be influenced to find adversely to an accused or punish him unduly because of a policy which sought to reduce the passing of worthless checks. I, therefore, encounter some difficulty with the conclusion of my brothers that justice will be better served by granting a rehearing on all charges and specifications.

Finally, the accused was found guilty of offenses for which he could have been sentenced to a dishonorable discharge, total forfeitures, and confinement for 34 years. Three months before the commission of those offenses he was convicted of having uttered seven worthless checks in the total amount of $205.00 to governmental agencies. He could barely have finished serving the sentence of confinement imposed in that case when he embarked upon this series of crimes. He ended up at the hands of the present court members with three years' confinement plus accessories, which in view of his record is quite reasonable. Accordingly, I find nothing in the punishment adjudged to justify a holding that the court members were under the spell of command influence.

Thus, I must dissociate myself from the conclusion reached by the majority, and while other questions have been asserted, in view of the disposition ordered by my associates, no purpose would be served by answering them.