Fred R. CHANDLER and Clifton Franks, Petitioners-Appellants,

v.

T. W. MARKLEY, Warden, United States Penitentiary, Terre Haute, Indiana, Respondent-Appellee.

No. 13286.

United States Court of Appeals Seventh Circuit.

June 9, 1961.

Alfred Avins, Chicago, Ill., for appellants.

Don A. Tabbert, U. S. Atty., Indianapolis, Ind., Major James C. Waller, Jr., Judge Advocate General's Office, Department of the Army, Washington, D. C., Philip R. Melangton, Jr., Asst. U. S. Atty., Southern District of Indiana, Indianapolis, Ind., Thomas A. Ryan, Lieutenant Colonel, JAGC, Office of The Judge Advocate General, Department of the Army, Washington, D. C., for appellee.

Before DUFFY and KNOCH, Circuit Judges, and GRUBB, District Judge.

KNOCH, Circuit Judge.

Fred R. Chandler and Clifton Franks, petitioners herein, are prisoners in the United States Penitentiary at Terre Haute, Indiana. They petitioned the District Court for writ of habeas corpus, which was denied. After denial of a motion for reconsideration, they appealed to this Court.

The petitioners, together with five other United States soldiers, were jointly tried in Germany by a United States General Court-Martial, which found them guilty of mass rape of a 15-year-old German girl on July 9, 1956. The Board of Review in the office of the Judge Advocate General of the Army reduced the life sentences imposed by the trial court to thirty years, although the Board found the findings and sentence of the trial court to be correct in law and fact. The United States Court of Military Appeals affirmed the decision of the Board of Review.

The petitioners contend that the inflammatory reaction of the press and the influence of hysterical community sentiment required a change of venue. Petitioners' motion for such change of venue was denied.

Petitioners further contend that command control, whether intentional or not, prevented a fair trial and review of their case.

On June 1, 1956, at an Army Commanders' Conference, more than a month before the offense with which petitioners were charged, General Bruce C. Clarke, Commanding General, United States Seventh Army, issued a statement deploring the number of incidents involving United States soldiers and German civilians, and suggesting preventive measures, including a statement that "any violations must be severely dealt with." In July, 1956, after petitioners had been arrested, General Henry I. Hodes, Commander-in-Chief, United States Army, Europe, at an Ambassador-Commander Conference, referred to community relations and directives issued on prevention of incidents. He said that one rape case involving seven soldiers and a 15-year-old girl had drawn unfavorable world-wide publicity which out-balanced 700 good deeds performed by United States soldiers. He recommended such means as administrative discharge of

likely offenders, better safeguard of weapons, and stricter control of "passes." The remarks of both Generals were given wide distribution for "information and guidance." [1]

At the trial petitioners were represented by competent military lawyers and civilian counsel of their own choice.

■ The General Court-Martial clearly had jurisdiction of the persons of petitioners and of the offense charged, which constituted an offense under the Uniform Code of Military Justice (10 U.S.C.A. § 801 et seq.), to which petitioners as United States soldiers were subject. The sentences imposed were within the lawful

1. In petitioners' brief these statements are described as follows:

In the Army Commanders' Conference held on June 1, 1956, General Bruce C. Clarke, Commanding General, U.S. 7th Army, issued a statement concerning German-American community relations which received complete distribution throughout all echelons of that army. The statement was issued for the "guidance" of all American Army commanders. General Clarke stated that "The play-up of incidents involving soldiers in the local German papers and in the papers at home is a matter of concern to me." After referring to certain preventive measures, General Clarke stated that "There are certain principles and procedures that can help in solving this problem." In part "c" of those orders is the requirement that "Any violations must be severely dealt with." Part "e" requires that the use or carrying of knives "will be severely dealt with." (Defense Exhibit A–10)

By endorsement dated June 27, 1956, the Commanding General, 7th Army, the person immediately superior to the convening authority in this case, ordered that his remarks be given general distribution for the "information and guidance" of all of his subordinates. (Defense Exhibit A–8) Colonel Van Sickle, the only court member asked, testified to having seen the statement. (R. 42)

On July 23, 1956, about ten days after the petitioners were arrested, General Henry I. Hodes, Commander-in-Chief, United States Army, Europe, spoke about this case at a USAREUR Ambassador-Commander Conference. He commenced his discussion by noting that "Another problem we are working on is better community relations, and that is becoming increasingly more important every day." He related the fact that "it has been necessary for me to issue several directives" on preventing incidents, and after criticizing subordinates by saying "Now it shouldn't have been necessary, in my opinion, to issue more than one directive on this subject," he declared that had the first directive been "exe-

cuted as was intended" the July incidents would not have occurred. He ended his criticism of subordinate commanders for past incidents by declaring that it shouldn't have been necessary for him "to have to spell out things in great detail but apparently from the results we must do so and I am going to spell them out." He followed with his comments on this case, as follows:

"I think it is a very sad commentary on us, as commanders, when the reputation of the United States Army—as a matter of fact, when the reputation of the United States—is permitted to be jeopardized by a few 'bums.' * * * it matters little that the U.S. Army personnel in Germany participated in about 700 worthwhile community events during the past three months when one rape case, in which seven soldiers repeatedly attacked a 15-year-old girl, draws unfavorable world-wide publicity. That one incident knocked out those 700 good deeds."

General Hodes then "demanded" that these incidents be stopped and that the prior directive be "vigorously" enforced. After noting that "legal" means for eliminating offenders existed, General Hodes commented on the fact that the offenders in the incidents had, in many cases, prior court-martial convictions. He also briefly commented on the ability of irresponsible soldiers to get weapons, and ordered that his subordinates be "strict" about leave and passes. General Hodes closed with this threat:

"Then somebody says that I need the Area Commander to fix my fence—well in that connection, I'd just get another commander. We can't have a commander that can't handle his outfit. * * * After a few examples when we look through these records and find that a unit is keeping poor, unsatisfactory soldiers or soldiers with a number of strikes against them then I think we need new commanders somewhere along the line. I think that all of our Inspector Generals should check on that subject along with other special items." Defense Exhibit A–7.

limits laid down by Congress in the Uniform Code of Military Justice. The record shows that complete review, pursuant to the provisions of the Uniform Code, was accorded the petitioners. Full consideration was given to all significant matters asserted here and in the District Court, including the request for change of venue. This Court may not consider those matters *de novo*. Burns v. Wilson, 1953, 346 U.S. 137, 73 S.Ct. 1045, 97 L. Ed. 1508.

■ In our study of the record, this Court has read and considered the statements on which petitioners base their assertion of command control both of the trial and the subsequent review. We must conclude with the Court of Military Appeals that:

"The clear thrust of the remarks of the Commander-in-Chief was the improvement of discipline by other than judicial processes; for example, the more extended use of administrative discharges for incorrigibles. They were detached from any and every court then existing; they were not directed toward any particular case; and they did not call for court-martial convictions, with their concomitant punitive discharges. \* \* \* We, therefore, conclude that the efforts of the Commander-in-Chief to buoy up sagging German-American relations did not constitute command control. [sub. nom. U. S. v. Carter, 25 CMR 370, 376]"

and with respect to General Clarke's statement:

"It was published to govern conduct of all military personnel, and it set out a variety of ways in which to better local conditions and improve military discipline. Its language was couched well within permissible limits, and we find nothing improper about its promulgation. [Ibid. 377]"

■ Instructions to the personnel of a Court-Martial may be given by the convening authority respecting rules of evidence, burden of proof and presumption of innocence and may also include information as to the state of discipline in the command, the prevalence of offenses which have impaired efficiency and discipline, and command measures which have been taken to prevent offenses. MCM 1951, ¶ 38.

All other arguments advanced by petitioners have been considered and found to be without merit.

The decision of the District Court is affirmed.